THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES M. ELIASON, Defendant-Appellant.

Second District No. 82—710

Opinion filed August 30, 1983.

686

Mary Robinson, of State Appellate Defender's Office, of Elgin, for appellant.

Robert J. Morrow, State's Attorney, of Geneva (Phyllis J. Perko and Judith M. Pietrucha, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE HOPF delivered the opinion of the court:

Defendant was convicted of murder following a jury trial in the circuit court of Kane County in violation of section 9—1(a)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(1)). He was sentenced to 20 years' imprisonment. On appeal he contends that: (1) the State did not sustain its burden of disproving self-defense beyond a reasonable doubt; (2) the trial court abused its discretion in denying defendant's motion for a mistrial where the State failed to disclose a statement of defendant's; (3) the trial court abused its discretion in denying defendant's motion for a mistrial where the arresting officer alluded to defendant's involvement in other crimes of a similar nature; and, (4) the prosecutor's cross-examination of defendant and closing argument regarding defendant's post-arrest, post-warning silence violated defendant's right to due process. We reverse.

The instant offense arose from the stabbing death of Ralph DiBattista on November 10, 1981, outside a tavern in East Dundee, Illinois. The State in its case-in-chief presented the testimony of five witnesses who viewed some of the occurrences prior to, during and after the crime. None of these witnesses, however, observed the initiation of the struggle between defendant and DiBattista; nor did they observe the actual stabbing. In addition to these witnesses, the State presented the testimony of two investigating officers who arrived on the scene minutes after the stabbing. The only evidence regarding the initiation of the fight and the actual stabbing itself came from defend-

ant's own testimony and that of Purifino Jimenez, a disinterested witness who was driving past the tavern at the time of the incident.

Scott Hartman, Ramiro Sanchez and Alexander Rascon were sitting together drinking beer at a table near the front window of the tavern. Scott Hartman observed defendant and DiBattista, the decedent, standing near each other at the bar. He saw DiBattista casually walk out of the bar. He could see DiBattista's hands as he walked out, but did not see anything in them; nor did he observe anything, including a knife, on his person. After DiBattista left, defendant finished his beer and left the bar "as if he was in a hurry." Approximately 10 seconds later, Hartman heard a thump against the west wall of the building. About 10 seconds later, defendant and the decedent appeared in front of the window and it looked as if they were wrestling. Hartman went out the door and observed defendant holding a bloody knife in his right hand and the decedent in the street holding his chest with both hands. Hartman did not see a knife on decedent's person, nor in his vicinity. Hartman returned inside the bar and 15 to 20 seconds later DiBattista re-entered the bar holding his chest. He went up to a man in a cowboy hat and told the man to take him to the hospital, that he had been stabbed. He then collapsed on the floor. Hartman could see the decedent at all times and did not see any weapons at any time; nor did he see DiBattista pass anything to anybody.

Although the three differed on minor points of testimony, Sanchez and Rascon substantially corroborated significant aspects of Hartman's testimony. After hearing the thump Sanchez looked out the window and saw defendant and decedent with their hands locked. He could see DiBattista's right hand, but not his left. Sanchez ignored the fight until he heard there was a knife. He then went to the window and saw defendant in the street holding a knife and DiBattista on the sidewalk. He could not see DiBattista's hands.

Rascon stated that several minutes after hearing the thump he got up and looked out the window and saw nothing. He turned around again a few seconds later and saw defendant walk nonchalantly, but at a quick pace, past the window in an easterly direction and disappear from view. He did not see a knife at that time, but believed defendant had a knife because he was wearing an open knife pouch and no knife was inside. He also saw blood on defendant's right hand and arm. About a minute later Rascon saw defendant run and disappear. He did not see DiBattista at any time until he re-entered the bar. He had a clear view of DiBattista at all times after he re-entered the bar and did not see a knife in his hands at any time; nor did he see anything pass between the decedent and the man in the cowboy

hat. Earlier that evening, Rascon accidentally bumped into the defendant in the bar and defendant stated, "You will pay for it later." Rascon told Sanchez there was "a rowdy down at the end of the bar."

Robert Carlson, another patron of the bar, testified that defendant and the decedent confronted each other inside the bar, although he did not hear what was said. DiBattista had come up to defendant from another part of the bar. Carlson said defendant and DiBattista then left the bar together, with DiBattista in front. Defendant, walking behind, reached behind him and flipped open a knife pouch which was hooked on his belt. Carlson saw a knife in the pouch. They both left the bar and a few minutes later DiBattista re-entered and collapsed on the floor. Carlson never saw DiBattista with a weapon; nor did he see him give anything to anybody.

Timothy Klaras, another patron, heard there was a fight outside. He stepped outside and saw defendant and DiBattista both on the sidewalk, and defendant was holding a knife in his right hand.

Officer Peters arrived at the scene and observed DiBattista lying on the ground. The officer did not notice any weapons in the area around the body or outside the tavern.

Officer Pena arrived on the scene after DiBattista had been transported to the hospital. He and Officer Peters searched the area outside the bar. No weapon was ever recovered. Based upon the investigation, Officer Pena believed the fight began in the alleyway west of the tavern. It was his opinion that based upon the location of the blood stains, no one from within the bar could have seen the entire struggle.

After the incident, defendant fled to Atlanta, Georgia. He turned himself in to the police four months later on March 15, 1982.

A lab report on blood stains discovered in the defendant's vehicle revealed that the blood could have been defendant's and could not have been DiBattista's. The report also concluded, among other things, that several stains found on DiBattista's jacket, boot, and on certain paper towels in defendant's home could have been either DiBattista's or Eliason's blood.

For the defense, Sally Baerr, the bartender, testified she bought defendant a drink called a "watermelon." Defendant refused the drink and threw it over his shoulder. DiBattista then walked up to defendant and the two talked, but she could not hear what was said. According to her, Eliason threw up his hand and left the bar with DiBattista leaving sometime after. Shortly thereafter, she heard a thump against the wall.

Ms. Baerr's version of events was corroborated by the testimony

of Ron Bailey, who came to the bar that night with defendant. Bailey also saw defendant and DiBattista exchanging words, Eliason throwing up his arm and then leaving the bar with DiBattista following. He stated it looked as though DiBattista had something in his hand because he was swinging his left arm and his right arm was next to his leg. Several minutes later, DiBattista stumbled back into the bar. He did not report what he saw to police because he did not want to get involved.

Harold Gerschefske, who had been acquainted with defendant for 10 or more years, testified he entered the bar when defendant was leaving. DiBattista left right after defendant. He said he also knew Joe Jacobs, the man in the cowboy hat whom DiBattista went up to before he collapsed. Jacobs always carried a knife and had a buck knife on his person when Gerschefske entered the bar. After the fight outside, Jacobs did not have the sheath on him, and Gerschefske saw Jacobs give something to his girlfriend to put in her purse. Gerschefske did not see anything in the decedent's hands when he came in.

Purifino Jimenez testified he was driving by the tavern at the time in question and saw two men come out of the bar. Defendant, described as "the shorter man," came out first and DiBattista, described as "the taller man," came out after him and went up to defendant from behind. The shorter man turned around and pushed the taller man. The two began shoving each other and the shorter man, while walking backwards, pulled out a knife and held it in front of him. The taller man walked towards him and defendant swung with the knife. No contact was made. The taller man again came towards the shorter one and the two made contact to the west of the bar. Mr. Jimenez never saw a knife on the taller man.

Defendant testified the bartender brought him a "watermelon," which he did not want. He threw the drink over his shoulder and it hit Ralph DiBattista. DiBattista tapped defendant on the shoulder, cussed at him and told him to watch what he was doing. DiBattista then walked away and several minutes later he returned and threw a drink in defendant's lap, saying "This is for the drink you spilled on me." No one other than defendant witnessed this event. Defendant turned to the bartender, said, "I am too old for this shit, and I am getting out of here," and made some gesture with his hand. He testified he knew DiBattista since 1977 and knew he had a bad record. He recalled certain prior altercations which the decedent had had with other individuals and stated that these incidents made him apprehensive about DiBattista at the time of the stabbing.

Defendant left the bar, checking the snap on his knife pouch, which he always did, and headed west. When he got to the corner of the tavern he felt a hand on his shoulder. He spun around and hit the corner of the building. He pushed DiBattista away, moved backwards, and saw something in DiBattista's right hand, but didn't know what it was. He backed up and pulled out his knife. DiBattista moved towards him and defendant saw a blade to a knife and took a swipe at DiBattista saying, "Stay away from me. I am leaving the bar and I don't want no trouble." DiBattista came at him again and the two grabbed each other, went backwards and hit the front of the building west of the window. Defendant grabbed decedent's right forearm with his left hand, and the decedent twice stabbed defendant's hand. Defendant went east past the doorway, and DiBattista threatened to kill defendant. DiBattista again advanced, but defendant sidestepped him, put his knife up and stabbed DiBattista. Defendant began to leave in a westerly direction, but first turned around to see if DiBattista was following him. DiBattista again threatened to kill defendant. No one other than defendant witnessed these threats against defendant's life. Although he was feeling dizzy and knew where the hospitals were located, he did not seek medical attention but instead drove to a restaurant where he called a friend who picked him up and drove him home. At home he called the tavern and learned DiBattista was taken to the hospital. Thinking DiBattista's friends might be after him, he told his wife to go to her mother's and he went to his friend's house. The next morning, he flew to Georgia where he was treated at a hospital under an assumed name. Several days later, defendant called his wife and learned DiBattista was dead. Defendant contacted his attorney, who advised him to surrender himself. In the first week of March 1982 defendant returned to Illinois and was staying at a Holiday Inn in Rolling Meadows when the police approached him and asked if he was James Max Eliason. Defendant responded he was not, and told them his name was Glenn Hopper. Defendant subsequently turned himself in on March 15, 1982.

Two Carpentersville policemen, Joseph Donahue and Anthony De-Pippo, testified for the defense regarding Ralph DiBattista's reputation for violence. In rebuttal, and over defendant's objection, Officer Pena testified that when defendant was being transported to the county jail he told the officer he did not know DiBattista prior to the incident in question, but had learned of his bad reputation only after the incident. This statement was not given to the defense prior to trial.

The jury returned a verdict of guilty on the murder charge and

judgment was entered on the verdict.

■■ We choose to first consider defendant's contention that he is entitled to a new trial because of the State's failure to disclose an oral statement made by defendant to Officer Pena after his arrest and after he had requested counsel. According to Officer Pena, defendant stated he did not know of DiBattista's reputation for violence prior to the instant offense. The statement was introduced by the State to rebut defendant's direct testimony that he knew of the victim's propensity for violence prior to the instant offense, and to rebut defendant's testimony on cross-examination that he did not recall telling Officer Pena that he had never heard of DiBattista. Defendant claims that the nondisclosure of this statement resulted in severe prejudice to him because it eliminated his opportunity for making informed strategic decisions, prevented him from gathering evidence to discredit Pena's rebuttal testimony, and prevented him from making a meritorious motion to suppress. The State contends the nondisclosure issue was waived when defendant failed to object to the prosecutor's initial cross-examination of defendant regarding the conversation he had with Officer Pena on the day he surrendered. Alternatively, the State maintains that its withholding of the statement was unintentional and that, in any event, the granting of a mistrial would have been a severe sanction under the circumstances of this case. For the reasons that follow, we agree that the error complained of requires reversal and entitles defendant to a new trial.

Initially, we do not view defendant's failure to object to the prosecutor's initial cross-examination of defendant regarding the challenged conversation as sufficient to constitute a waiver of this issue. Defense counsel at that time was unaware that such a conversation in fact existed, and therefore cannot be faulted for failing to object to seemingly nonexistent evidence. (See *People v. Nelson* (1980), 92 Ill. App. 3d 35, 44-45, 415 N.E.2d 688, *cert. denied* (1981), 454 U.S. 900, 70 L. Ed. 2d 217, 102 S. Ct. 404, where this court reviewed the nondisclosure issue despite defendant's failure to object to the initial reference to the evidence on cross-examination; see also *People v. Boucher* (1978), 62 Ill. App. 3d 436, 438, 379 N.E.2d 339.) Thus, we turn to the merits of defendant's claim.

■■ ■ Supreme Court Rule 412(a)(ii) provides that the State must disclose to defendant "any written or recorded statements and the substance of any oral statements made by the accused * * * and a list of witnesses to the making and acknowledgement of such statements." (87 Ill. 2d R. 412(a)(ii); *People v. Weaver* (1982), 92 Ill. 2d 545, 559, 442 N.E.2d 255.) The rule encompasses not only formal

statements made to the authorities but also statements made to anyone that might have a bearing on the defendant's guilt or innocence. (92 Ill. 2d 545, 559, 442 N.E.2d 255.) It is a continuing duty which is violated whether the State's neglect was inadvertent or purposeful. (92 Ill. 2d 545, 559, 442 N.E.2d 255.) Compliance with the rule is only excused where the prosecutor is unaware of the existence of the statement prior to trial and could not have become aware of it in the exercise of due diligence. *People v. Brown* (1982), 106 Ill. App. 3d 1087, 1092, 436 N.E.2d 696.

■ In the present case, it is clear that defendant was entitled to the substance of his oral statement to Office Pena. The record establishes that the prosecutor learned of the statement just prior to trial but did not disclose it to the defense because he "did not think it would be used." This indicated a clear misunderstanding of the discovery rules, since a defendant's oral statements, when requested, are required to be disclosed whether or not they are intended to be used by the prosecution. (87 Ill. 2d R. 412(a)(ii).) We further doubt the State's Attorney's assertion that he did not think the statement would be used. The State was aware that defendant would claim self-defense, and also that he intended to demonstrate DiBattista's reputation for violence by evidence of his past acts of violence against third persons. A motion *in limine,* made by the prosecution prior to its discovery of the statement, sought to limit evidence of DiBattista's past and indicated that the State anticipated defendant would demonstrate his own knowledge of DiBattista's reputation for violence. Further, defense counsel on several occasions asked for the substance of Pena's rebuttal testimony, and each time the prosecutor could not recall the challenged testimony. However, this was the first question asked when Officer Pena took the stand. Under these circumstances, we think it is evident that the State's failure to disclose the statement was an intentional violation of the discovery rules.

■ However, not every violation requires a new trial. (*People v. Greer* (1980), 79 Ill. 2d 103, 120, 402 N.E.2d 203.) A new trial should only be ordered when a defendant is prejudiced by the discovery violation and the trial court fails to eliminate that prejudice. (*People v. Weaver* (1982), 92 Ill. 2d 545, 560, 442 N.E.2d 255.) Numerous avenues exist for the elimination of prejudice at the trial level. The trial court may order disclosure of the information, grant a continuance, exclude such evidence, or enter such order as it sees fit under the circumstances. It may also subject the attorney himself to sanctions if his violation is wilful. (92 Ill. 2d 545, 560, 442 N.E.2d 255.) The closer the evidence, the stronger is the case for excluding the statement or

declaring a mistrial. (92 Ill. 2d 545, 560, 442 N.E.2d 255.) Other factors to be considered are the strength of the undisclosed evidence, the likelihood that prior notice could have helped the defense discredit the evidence, the feasibility of continuance rather than a more drastic sanction, and the wilfulness of the State in failing to disclose. 92 Ill. 2d 545, 560, 442 N.E.2d 255.

██ We agree with defendant that he was prejudiced by the discovery violation here, and that prejudice was not eliminated by the trial court. Defendant claimed on direct examination to have known of DiBattista's reputation for violence prior to the incident. This testimony was the only evidence of defendant's prior knowledge of DiBattista and was offered for the purpose of proving the reasonableness of defendant's belief that deadly force was necessary to repel DiBattista's assault upon him. Defendant's state of mind was critical to establishing his self-defense claim. Officer Pena's testimony directly contradicted defendant's testimony at trial and cast serious doubt upon defendant's credibility in general. This result is particularly prejudicial here, since defendant was the only person to witness the entire incident and his version of events was corroborated in significant respects by two disinterested witnesses, Purifino Jimenez and Sally Baerr. In addition, it is uncontested that the statement was made after defendant asserted his right to counsel and the authorities were aware that communication with him was to be through his attorney only. (See *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880.) While there are insufficient facts in the record to determine whether defendant's right to counsel was violated, it is clear that the statement was subject to a motion to suppress which may have been successful. The prosecutor below argued that a statement taken in violation of *Miranda* is nonetheless admissible for impeachment purposes if it was voluntarily given. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602; see *Oregon v. Hass* (1975), 420 U.S. 714, 43 L. Ed. 2d 570, 95 S. Ct. 1215; *Harris v. New York* (1971), 401 U.S. 222, 28 L.Ed. 2d 1, 91 S. Ct. 643.) We agree with this general proposition of law. However, we interpret *Harris* and *Hass* as contemplating a situation in which the admissibility and voluntariness of a defendant's statement has already been fully litigated prior to trial. We conclude that the State's failure to disclose the statement prior to trial improperly and unfairly deprived defendant of the opportunity to test its admissibility as both substantive and impeachment evidence against him.

██ ██ The State argues that defendant's failure to request a continuance negates his claim of surprise. (See *People v. Nelson*

(1980), 92 Ill. App. 3d 35, 45, 415 N.E.2d 688, *cert. denied* (1981), 454 U.S. 900, 70 L. Ed. 2d 217, 102 S. Ct. 404.) While such a failure would generally be fatal to defendant's claim of surprise on appeal (*People v. Smith* (1982), 111 Ill. App. 3d 895, 905, 444 N.E.2d 801; *People v. Nelson*), we do not think this alternative would have remedied the prejudicial effect of the statement at trial. A continuance may have allowed defense counsel the opportunity to discover the context in which the statement was made and to possibly put a different interpretation upon the statement under those circumstances or to discredit Pena's testimony altogether. (See *People v. Weaver* (1982), 92 Ill. 2d 545, 561, 442 N.E.2d 255.) However, since there is a real question of a *Miranda* violation here, and whether the statement was made voluntarily, we think defendant should have been given an opportunity prior to trial to make a motion to suppress to litigate these issues. A continuance, therefore, may have alleviated some of the prejudice, but with prior notice the statement may have been eliminated altogether or at least caused a change of strategy. We conclude that the trial court erred in failing to grant a mistrial under these circumstances. Thus, in accordance with the principles announced in *People v. Weaver* (1982), 92 Ill. 2d 545, 442 N.E.2d 255, the cause is reversed and remanded for a new trial.

 We are next required to review the sufficiency of the evidence against defendant, since a failure to do so may subject defendant to double jeopardy upon retrial. (*People v. Taylor* (1979), 76 Ill. 2d 289, 309, 391 N.E.2d 366, 375.) Defendant argues that the evidence was insufficient to prove him guilty of murder beyond a reasonable doubt because the State's evidence did not contradict defendant's evidence in any significant respect, but instead contradicted each other and corroborated his version of events.

 A person is justified in using deadly force when that person "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself ***." (Ill. Rev. Stat. 1981, ch. 38, par. 7—1; *People v. Ellis* (1982), 107 Ill. App. 3d 603, 611, 437 N.E.2d 409; *In re S.M.* (1981), 93 Ill. App. 3d 105, 109, 416 N.E.2d 1212.) To determine whether a killing is justified under self-defense, the question is whether defendant's belief that he had to use deadly force was reasonable under the circumstances. (*People v. Aguero* (1980), 87 Ill. App. 3d 358, 363, 408 N.E.2d 1092.) This is a question for the trier of fact to decide, and its finding will not be set aside on review unless the evidence is so unsatisfactory as to leave a reasonable doubt of defendant's guilt. (*Aguero.*) Finally, when the defendant is the only witness to the event in question and his testimony alleg-

edly constitutes the only evidence of what actually took place, the trier of fact is not obligated to accept all, or even any part, of his statements but may consider the reasonableness of the defense offered, assess its probabilities, if any, and reject that evidence which it finds contradictory, unlikely, or improbable in light of other facts before it. *People v. Lynom* (1981), 97 Ill. App. 3d 1113, 1117, 423 N.E.2d 1281.

We have reviewed the record and find that the jury's verdict finding defendant guilty of murder was supported by the evidence. Under all the facts, it was reasonable for the jury to conclude that defendant was the aggressor of the fight as exhibited by his actions just prior to leaving the bar. It was also reasonable to conclude, even if DiBattista did initiate the struggle, that defendant's use of deadly force was unjustified in light of the absence of any evidence other than defendant's testimony that DiBattista had a weapon, and in light of defendant's testimony that he pulled a knife prior to actually seeing a knife in DiBattista's hand. (See *People v. Ellis* (1982), 107 Ill. App. 3d 603, 437 N.E.2d 409.) Defendant's flight from the scene is also indicative of a consciousness of guilt. (*People v. Jackson* (1981), 100 Ill. App. 3d 1064, 1069, 427 N.E.2d 994.) The inconsistencies noted in the testimony of the State's witness (*i.e.,* where witnesses were seated in the tavern, whether the bartender said anything after hearing the "thump," and the locations of DiBattista and defendant outside) were all minor and do not destroy the witnesses' credibility but only affect the weight given to their testimony. *People v. Schroeder* (1982), 105 Ill. App. 3d 677, 679, 434 N.E.2d 546.

Because the other issues raised by defendant could recur upon retrial of this cause, we will briefly address them here.

Defendant contends that certain testimony by Officer Pena alluding to other crimes "of this nature" denied him a fair trial. On direct examination, Officer Pena was asked by the prosecutor whether he spoke to defense counsel in November or early December 1981. The officer responded affirmatively, and the prosecutor asked:

"Q. And what did you inform him?

A. I informed Mr. Mahoney that our agency had an arrest warrant for murder on Mr. Eliason; that I was aware of the fact that Mr. Mahoney had represented him in a previous case, and that Mr. Mahoney had always had his client's cooperation in getting himself turned in with reference to situations of this nature."

Defense counsel objected to this testimony and moved for a mistrial. The motion was denied, but the court instructed the jury to disregard

the testimony regarding "previous incidents of this nature."

Evidence that tends to show that an accused has committed crimes or acts of misconduct which are distinct and entirely unrelated to the ones for which he is being tried generally is both incompetent and prejudicial. (*People v. Johnson* (1981), 102 Ill. App. 3d 122, 129, 429 N.E.2d 905; *People v. Banks* (1981), 98 Ill. App. 3d 556, 564, 424 N.E.2d 898.) Although the reference here was only to "incidents," rather than "arrests" or "convictions," the jury was nonetheless alerted to the fact, whether true or false, that defendant had had previous encounters with the police and that he had also fled from those incidents. More significantly, however, is that within the context of this case, the reference to "incidents of this nature" led to the inference that defendant was involved in other acts resulting in death to another person. In fact, no such prior incident appears in the record. We therefore agree that the challenged testimony was prejudicial and constituted error, which upon retrial should be avoided.

 █ Finally, defendant contends that the prosecutor's cross-examination of defendant and closing argument regarding defendant's post-arrest silence violated due process. See *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240.

We first note that the prosecutor's initial question on cross-examination referred to defendant's silence *prior* to his arrest during long-distance phone calls to Officer Pena. However, this line of questioning then extended into defendant's post-arrest silence without objection by defendant. In closing argument, the prosecutor referred generally to defendant's failure to claim self-defense prior to trial, and in this context spoke of defendant's conversations with Officer Pena prior to and upon his arrest in which no such claim was made.

In *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, the Supreme Court held that a defendant's post-arrest, post-warning silence cannot be used to infer that a subsequent exculpatory story has been fabricated. The court stated that under these circumstances, the defendant's silence may be nothing more than the exercise of his rights. (426 U.S. 610, 617, 49 L. Ed. 2d 91, 97, 96 S. Ct. 2240, 2244.) In *Fletcher v. Weir* (1982), 455 U.S. 603, 607, 71 L. Ed. 2d 490, 494, 102 S. Ct. 1309, 1312, however, the court held that where a defendant takes the stand and testifies to an exculpatory version of events, the State is entitled to impeach the defendant by his post-arrest silence as long as the record does not indicate the silence was preceded by *Miranda* warnings or some other governmental assurance. Finally, in *Jenkins v. Anderson* (1980), 447 U.S. 231, 239, 65 L. Ed. 2d 86, 95, 100 S. Ct. 2124, 2129, the court held that a

defendant may be impeached by his pre-arrest silence if it is permitted under the State's own evidentiary rules.

In the instant case the prosecutor's cross-examination regarding defendant's pre-arrest, prewarning silence is proper under the authority of *Jenkins v. Anderson* (1980), 447 U.S. 231, 239, 65 L. Ed. 2d 86, 95, 100 S. Ct. 2124, 2129. However, as to the questions regarding defendant's post-arrest silence, it is clear from the record that defendant had received *Miranda* warnings at that time from Officer Pena and chose to remain silent about the case. (*Cf. People v. Hinson* (1979), 70 Ill. App. 3d 880, 388 N.E.2d 899.) The record also indicates that defense counsel informed Officer Pena that defendant would not be answering any questions about the case. (*Cf. Fletcher v. Weir* (1982), 455 U.S. 603, 607, 71 L. Ed. 2d 490, 494, 102 S. Ct. 1309, 1312.) We, therefore, conclude that it was improper for the prosecutor to question defendant about his post-warning, post-arrest silence.

For the foregoing reasons, the judgment of the circuit court of Kane County is reversed and remanded for new trial in accordance with this opinion.

Reversed and remanded.

REINHARD and NASH, JJ., concur.