THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LARRY BROWN, Defendant-Appellant.

First District (6th Division)   No. 1—90—1305

Opinion filed December 2, 1991.

704

Anita Rivkin-Carothers, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Michael Latz, and Gregory Vaci, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE RAKOWSKI delivered the opinion of the court:

Following a bench trial, defendant was found guilty of murder, but defense counsel filed a motion for a new trial which was granted. Defendant was retried before a jury and again found guilty of murder. He was sentenced to 40 years in the Illinois Department of Corrections. The issues on appeal are: (1) whether defendant's retrial was barred by double jeopardy under the fifth and fourteenth amendments of the United States Constitution; (2) whether the testimony of several of the State's witnesses was prejudicial and constituted reversible error; (3) whether defendant was denied a fair trial because of the prosecutors' misconduct during the trial and in opening and closing argument; (4) whether the trial court erred in refusing to give the jury the voluntary manslaughter instruction; and (5) whether defendant was prejudiced by the State's witness' comments to the judge in the presence of the jury that he was fearful of his family's safety. We affirm.

Defendant was charged with the murder of Gregory Nelson. His first trial was a bench trial in September 1988, before Judge Themis N. Karnezis. At that trial, the State presented the testimony of Tommorrah Dukes, who was purportedly one of the eyewitnesses to the victim's murder. At the hearing on defendant's motion for a new trial, Dukes recanted her trial testimony and testified that she had been given money by the State to temporarily relocate in Texas as well as for other living expenses. The trial judge granted defendant's motion for a new trial based on the State's failure to disclose to defense counsel that Dukes had been relocated and had received funds from the State's Attorney's office as well as her recanted testimony. The second trial, in March 1990, was a jury trial before Judge Thomas J. Maloney.

At that trial, Officer Henry Hill testified that at around 2:30 a.m. on February 3, 1987, he was driving his squad car when he was informed by a passenger of another vehicle that a man had been shot in the alley at 47th Street and Evans Avenue. When Hill arrived at this location, he found the victim lying facedown with blood by his head. Hill spoke to Vernon Williams, who was also at the scene. Williams informed Hill that the victim had been shot by defendant. Hill then sent a message over the police radio giving defendant's description and his last known location.

Vernon Williams testified that he was with Tommorrah Dukes and the victim at Dukes' apartment on the night of the shooting. Sometime after 1:30 a.m. Dukes went to the store, and when she returned, Williams overheard her talking to defendant on the back porch. Williams stated that defendant was arguing with Dukes about having sex with him, and Dukes responded that defendant was too young for her. The victim went to the back porch and told defendant to leave Dukes alone. Defendant replied "Fuck you" and threatened the victim. When the victim told defendant to leave, defendant said "I will shoot your ass." Defendant then went downstairs but continued to threaten the victim. At one point, defendant told the victim to come downstairs so that he could kill him. When this occurred the victim went inside and had a drink with Williams and Dukes.

At around 2:20 a.m. the victim wanted to go out to start his car. Williams looked outside and saw that defendant was sitting in his car at the edge of the alley. Williams told the victim that defendant was still in the alley and warned him not to go out, but the victim disregarded the warning and left. When the victim went downstairs, Williams heard a gunshot. He went out on the back porch, where he saw defendant standing over the victim, who was lying facedown in the alley. Williams saw a pistol in defendant's hand, and as he ran downstairs, he heard another gunshot. He then saw defendant shoot the victim several more times before defendant fled.

Williams stopped a squad car and told the police officer what had occurred. Williams then went with the officer to the police station where he was shown a picture of defendant's brother, Virgil Brown. Williams told the police that the coat Virgil Brown was wearing in the picture was the one defendant had worn that night but that Virgil Brown was not the one who shot the victim.

At the end of his testimony Williams told the trial judge that he was afraid of his family being harmed. After some comment, the trial judge sustained defense counsel's objection. He told the witness not to be concerned and denied a motion by defense counsel for a mistrial.

Detective Allen Szudarski, a Chicago police officer, testified that on February 3, 1987, at around 2:30 a.m. he saw a squad car at 47th Street and Evans Avenue. A woman who was subsequently identified as Tommorrah Dukes was waving to him to stop his vehicle. Szudarski then saw Vernon Williams talking to two police officers and also saw the victim's body. Szudarski talked with Dukes for several minutes and then sent a message over the police radio with defendant's name and last known location. A license check made of the brown, 1976 motor vehicle revealed that it was registered in defendant's name. When Szudarski received this information, he tried to locate defendant at the residences of defendant's relatives and friends but was unsuccessful. Szudarski then obtained an arrest warrant which was circulated on a nationwide computer. Defendant was apprehended 10 months later.

Dr. Mitra Kalelkar, an expert in forensic psychiatry, testified that she performed an autopsy on the victim and found numerous injuries to the face and head and brain matter at the site of these injuries. Kalelkar also found one gunshot wound in the victim's chest and four gunshot wounds to the back of his head. Kalelkar also found alcohol and cocaine in the victim's bloodstream. It was Kalelkar's expert opinion that the victim died of multiple gunshot wounds.

Detective John Markham testified that he was assigned to follow up on the outstanding warrant for defendant's arrest. Markham apprehended defendant on December 12, 1987. He was placed in handcuffs and searched. As a result of the search, defendant was found in possession of false identification cards which had defendant's picture but another name. The cards had been issued in May and June 1987, which was subsequent to the victim's murder.

At the police station, defendant was read his *Miranda* rights and he stated that he understood them. Defendant was then interviewed by Markham and Detective Steve Glynn. When questioned about the victim's murder defendant stated that he had gone to 4711 South Evans to visit his nephew but that he was not home. According to Markham's testimony, defendant claimed that he was coming down the stairs to leave when an argument erupted between him and the victim, who was on the second floor. Defendant's brother, Virgil Brown, intervened, and the argument ended. Defendant claimed that he and his brother left the building, and he did not hear about the victim's death until later that evening. At this point Markham told defendant that there was an eyewitness who had seen defendant shoot the victim and that they had also talked to defendant's brother, Virgil Brown. Defendant then replied that he wanted to tell the truth.

According to Markham, defendant then stated that the victim made a remark to him as defendant was walking up to the fourth floor to see his nephew and made another remark when defendant was coming back down. Both men started arguing, but defendant's brother intervened. The argument ended and defendant and his brother left. Defendant then stated that he was walking toward his car when he saw the victim standing in front of the building with a gun in his hand. At this point defendant pulled out his gun and shot the victim three times. Defendant claimed that the victim did not immediately fall to the ground so that he continued shooting until the victim did fall. Defendant then fled and disposed of his gun. After hearing the second version of defendant's account of the shooting, Markham contacted the felony review unit of the State's Attorney's office. Assistant State's Attorney Christopher Cummings responded, and in Markham's presence, interviewed defendant. Markham testified that defendant told Cummings the second version of the shooting. Cummings then asked defendant how the victim had received four gunshot wounds to the back of the head if he had been facing defendant. However, defendant did not respond to the question.

Assistant State's Attorney Cummings testified that on the morning of December 12, 1987, he spoke with Detectives Markham and Glynn regarding the homicide of Gregory Nelson. He also spoke with Vernon Williams and Tommorrah Dukes. Cummings then advised defendant of his *Miranda* rights and interviewed defendant in the presence of Markham and Glynn. According to Cummings' testimony, defendant claimed that he and the victim had an argument over drugs and defendant shot him in self-defense. However, defendant did not respond when Cummings asked how the victim was shot in the back of the head if he was facing defendant.

Patricia Dorsey, defendant's fiancee, testified in his behalf. She stated that she was dating defendant at the time of the incident and that he was with her on February 2 and 3, 1987.

After Dorsey's testimony, defense counsel moved for a mistrial based on the testimony of Markham and Cummings that defendant did not respond when asked how the victim could have been shot in the back of the head if he was facing defendant when the shooting occurred. The trial judge denied defense counsel's motion, finding that the admission of the testimony was not a violation of the fifth amendment.

Defendant testified that he was at his mother's house at 652 West Garfield on February 2, 1987. At 10 p.m. he went to 4711 South Evans to bring his sister-in-law some money to buy Pampers. Defend-

ant went up the back stairs to the fourth floor but found no one at home. When defendant started coming down the stairway the victim said that he did not want defendant going up and down the stairs while the victim conducted business. Defendant's brother tried to intervene, but the victim told them to stay out of his business. Defendant further testified that he did not have a gun in his possession on the night of the shooting, and he stated that he did not shoot the victim.

Defendant testified that he was arrested and taken to the police station on December 11, 1987. He was then interviewed by Detectives Markham and Glynn. Defendant testified that Markham told him that he would have a better chance of beating the murder charge if he claimed that he shot the victim in self-defense.

After the defense rested, jury instructions on voluntary manslaughter and self-defense were tendered to the court. Both instructions were denied on the basis that neither defense was raised during the trial. After closing argument, the jury found defendant guilty of murder. Defense counsel again moved for a new trial, and a hearing was held on the motion. Tommorrah Dukes testified at the hearing that Vernon Williams was at her apartment on the night of the shooting and that they were both drinking and using drugs. Dukes also stated that she saw defendant on the back porch that night, but she denied that he made any sexual remarks to her. Dukes then stated that on the night before defendant's second trial she received a call from an assistant State's Attorney by the name of Epach, who told her that she would be arrested on an outstanding warrant if she appeared in court. After defendant's second trial, the same assistant State's Attorney told her that he had straightened things out with her probation officer.

The trial court found that the State had done nothing to prevent the appearance of Dukes at defendant's second trial. The court further found that Dukes had not been a credible witness at any time throughout the course of the litigation.

Defendant contends that his retrial was barred by double jeopardy because there was insufficient evidence and prosecutorial overreaching which caused the ruling for a new trial. The alleged prosecutorial overreaching referred to by defendant was the State's failure to disclose to defense counsel that one of its witnesses had received relocation compensation prior to her appearance at the first trial.

The fifth amendment of the United States Constitution as well as article I, section 10, of the Illinois Constitution provide that no person shall be twice put in jeopardy for the same offense. (U.S. Const.,

amend. V.; Ill. Const. 1970, art. I, §10; *People v. Mink* (1990), 141 Ill. 2d 163, 173, 565 N.E.2d 975.) For double jeopardy purposes, courts have repeatedly distinguished between the reversal of convictions based on trial error as opposed to evidentiary insufficiency. (*Mink*, 141 Ill. 2d at 173, citing *Lockhart v. Nelson* (1988), 488 U.S. 33, 102 L. Ed. 2d 265, 109 S. Ct. 285, and *Burks v. United States* (1978), 437 U.S. 1, 57 L. Ed. 2d 1, 98 S. Ct. 2141.) A reversal for trial error is a determination that defendant has been convicted through a judicial proceeding which contains certain defects such as the incorrect admission or rejection of evidence, incorrect instructions or prosecutorial misconduct. Retrial in these instances is not precluded by the double jeopardy clause. On the other hand, reversal of a conviction based on insufficient evidence, which occurs when the prosecution has failed to prove its case, requires a judgment of acquittal. In this instance, the State is barred by the double jeopardy clause from retrying defendant once a reviewing court has determined that the evidence introduced at trial was legally insufficient to convict. *Mink*, 141 Ill. 2d at 174, citing *Burks*, 437 U.S. 1, 57 L. Ed. 2d 1, 98 S. Ct. 2141.

In the case *sub judice*, defendant's conviction was reversed and a new trial granted on defendant's motion. The motion was granted based on the trial court's finding that the State had failed to disclose that compensation had been paid to their eyewitness, Tommorrah Dukes, prior to her testimony at trial as well as the recantation of her testimony.

■ Defendant first argues that his second trial was barred by double jeopardy because the failure of the State to disclose Dukes' relocation and compensation constituted bad faith and prosecutorial overreaching. Prosecutorial overreaching is defined as prosecutorial misconduct specifically designed to cause or provoke a mistrial in order to obtain a second, more favorable opportunity to convict the accused. (*People v. Pendleton* (1979), 75 Ill. App. 3d 580, 593, 394 N.E.2d 496, citing *United States v. Dinitz* (1976), 424 U.S. 600, 47 L. Ed. 2d 267, 96 S. Ct. 1075.) The conduct is also described as that which is motivated by bad faith to harass or prejudice the accused. (*Pendleton*, 75 Ill. App. 3d at 593.) Initially we note that by its definition "overreaching" is conduct designed to provoke a mistrial and that in the instant case there was no mistrial. We further find no evidence that the State's actions were designed to give them a second opportunity to convict defendant or that its failure to disclose the information regarding Dukes was otherwise motivated by bad faith intended to prejudice or harass the defendant. (*Pendleton*, 75 Ill. App. 3d at 593.) In fact, at the hearing on defendant's first motion for a

new trial, the trial judge made a specific finding that, although the State should have disclosed the information to defendant, there was no impropriety in the State's conduct. Both *Pendleton* (75 Ill. App. 3d 580) and *People v. Rogers* (1984), 123 Ill. App. 3d 780, 463 N.E.2d 211, cited by defendant, are distinguishable because the prosecutor's misconduct in both instances resulted in a mistrial.

■ Defendant also claims that a new trial is barred by double jeopardy because absent Dukes' testimony, which she recanted, the evidence was insufficient to convict. We first note that, although Dukes recanted her trial testimony, and the recantation was included as one of the reasons for granting a new trial, there was no evidence that the trial judge believed the recanted version of her testimony. Therefore, there is no reason to consider the evidence of defendant's guilt absent her testimony. However, assuming, *arguendo*, that the evidence of defendant's guilt is considered without Dukes' trial testimony, we still conclude that there was sufficient evidence of defendant's guilt.

Proof of a criminal offense involves proof beyond a reasonable doubt that a crime was committed and that it was committed by the person charged. Thus, "[p]roof of *corpus delicti* requires both proof of injury or loss, as well as proof of criminal agency." (*People v. Lambert* (1984), 104 Ill. 2d 375, 378, 472 N.E.2d 427, citing VII Wigmore, *Evidence* §2072 (Chadbourn rev. ed. 1978).) The *corpus delicti* cannot be proved by defendant's confession alone, and there must be some independent or corroborating evidence to establish that a crime occurred. If the evidence corroborates the facts contained in defendant's confession, it may be considered along with defendant's confession to establish the *corpus delicti. Lambert*, 104 Ill. 2d at 378-79.

Defendant argues that his statement to the police and assistant State's Attorney that he shot the victim in self-defense was not corroborated by the physical evidence presented at the trial. While the fact that the victim was shot in the back of the head does not corroborate a self-defense claim, it does corroborate murder, which was the offense of which defendant was convicted. Thus, defendant's statement that he was at the scene where the victim's body was found and that he shot the victim when considered with the physical evidence was sufficient, in and of itself, to convict.

Defendant also argues that his second trial should have been barred because the State should not have been given a second opportunity to present evidence they failed to present at the first trial. The evidence which defendant claims was improperly admitted was the testimony of Vernon Williams that he saw defendant shoot the victim.

Williams had been listed as one of the State's witnesses at the first trial but had not testified.

"On a new trial of a case, an action should be tried *de novo* as though there had been no previous trial." (*People v. Boose* (1980), 85 Ill. App. 3d 457, 460, 406 N.E.2d 963.) Thus, we find no reason that the State should have been precluded from presenting Williams' testimony. We are also unpersuaded by defendant's citation to authority where the evidence was insufficient. (See *Burks*, 437 U.S. 1, 57 L. Ed. 2d 1, 98 S. Ct. 2141; *Green v. United States* (1957), 355 U.S. 184, 2 L. Ed. 2d 199, 78 S. Ct. 221.) For the aforementioned reasons, we conclude that defendant's trial was not barred by double jeopardy.

Defendant next contends that testimony of several of the State's witnesses constituted reversible error. Defendant first claims that the testimony of Officer Markham and Assistant State's Attorney Cummings regarding defendant's post-arrest silence was a due process violation. The allegedly improper testimony referred to a conversation that Cummings had with defendant at the police station shortly after his arrest. When defendant first arrived at the police station Markham advised him of his *Miranda* rights. Defendant then spoke with Markham and Detective Glynn about the circumstances of the shooting. After Markham spoke with defendant, Cummings arrived at the station and interviewed defendant in Markham's presence. Prior to his conversation with defendant, Cummings also advised defendant of his *Miranda* rights. Cummings then asked defendant about his involvement in the victim's shooting. Cummings testified that defendant initially told him that he and the victim had an argument over drugs and that defendant shot the victim in self-defense while they were facing each other. Cummings then testified that he asked defendant why the victim had four shots in the back of his head if defendant was facing the victim when he shot him. Cummings stated that defendant had no response to this question. Detective Markham also testified that defendant did not reply when Cummings asked how the victim could have been shot in the back of the head if defendant was facing the victim when he shot him. It was this failure to respond that defendant claims was a violation of his right to due process.

In support of his argument, defendant first cites *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, which held that the prosecution may not impeach defendant's exculpatory story, told for the first time at trial, by cross-examining defendant about his silence after being advised of his *Miranda* rights at the time of his arrest. However, where a defendant has been advised of his *Miranda* rights and subsequently waives them, the jury may consider the entire

communicative process in order to better evaluate the meaning and accuracy of the statements that were made. (*People v. Gan* (1979), 76 Ill. App. 3d 961, 963, 395 N.E.2d 411; *People v. Henson* (1978), 58 Ill. App. 3d 42, 46, 373 N.E.2d 852.) A defendant waives his rights when after being informed of them he states that he understands them but chooses to speak to an officer without requesting an attorney. *People v. Eatherly* (1979), 78 Ill. App. 3d 777, 781, 397 N.E.2d 533.

■ In this case, Cummings advised defendant of his *Miranda* rights prior to his conversation with defendant regarding the circumstances of the shooting. Defendant acknowledged that he understood his rights and agreed to talk to Cummings without requesting the presence of an attorney. Thus defendant waived his rights, and the testimony regarding defendant's conversation with Cummings including his failure to respond to Cummings' final question was properly admitted. *People v. Earl* (1980), 89 Ill. App. 3d 980, 412 N.E.2d 645, and *People v. Hockaday* (1979), 69 Ill. App. 3d 294, 387 N.E.2d 409, cited by defendant are distinguishable because the defendants in those cases did not waive their rights and chose instead to remain silent. Thus, in those cases, unlike the instant case, it was reversible error to use their choice of silence against them at the trial.

■ Defendant next claims that the testimony of Detective Szudarski that he had known defendant for about one year and was familiar with defendant's addresses was prejudicial error as evidence of other criminal activity. Proof of prior criminal activity is generally inadmissible unless the evidence is being presented to show *modus operandi*, motive, intent or the identity of the accused. (*People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612.) However, an officer's testimony that he was acquainted with defendant does not necessarily imply a criminal record. (*People v. Hoddenbach* (1983), 116 Ill. App. 3d 57, 62, 452 N.E.2d 32.) Whether the evidence is prejudicial depends on the purpose for which it is being presented. The *Hoddenbach* court distinguished *People v. Stover* (1982), 89 Ill. 2d 189, 432 N.E.2d 262, which is also cited by defendant in this case. In *Stover*, the court held that the officer's testimony regarding his prior acquaintance with defendant was improper because there was no apparent purpose for its admission other than the implication of prior criminal activity. The *Hoddenbach* court, however, found that similar testimony was proper because it was "incidental to [the officer's] description of the search for the defendant and the car." (*Hoddenbach*, 116 Ill. App. 3d at 62.) In this case, Szudarski testified that he tried to locate defendant following his conversation with Tommorrah Dukes. He then stated that he sent a message over the police radio

with defendant's last known location and his address. He also went to the residence of defendant's family as well as other locations defendant was known to frequent. It was in the context of describing the steps he took to find defendant that Szudarski made the statement that he had known defendant for about one year. Therefore, the admission of the statement was proper as incidental to Szudarski's description of his search for defendant. *People v. Lampkin* (1983), 98 Ill. 2d 418, 457 N.E.2d 50, and *People v. Eliason* (1983), 117 Ill. App. 3d 683, 453 N.E.2d 908, also cited by defendant, are factually distinguishable. In *Lampkin* the officer testified that he had arrested defendant six years earlier and that defendant had made the statement " '[y]ou white honky coppers are [messing] with us now, and we will get you later.' " (*Lampkin,* 98 Ill. 2d at 424.) In *Eliason* the officer testified that defendant had fled from him on prior occasions. (*Eliason,* 117 Ill. App. 3d at 696-97.) In both cases the statements had a greater implication of criminal activity than in *Hoddenbach* or the instant case, and there was no probative value in the prejudicial testimony.

Defendant next claims that the reference by the victim's sister to the fact that the victim had a three-year-old son was prejudicial because it was presented in a manner which led the jury to believe that it was material to the issue of defendant's guilt. Generally, in a murder case where evidence that the victim left a spouse and family is not elicited incidentally but is presented in a manner which causes the jury to believe that it is material, its admission is highly prejudicial and constitutes reversible error. (*People v. Hope* (1986), 116 Ill. 2d 265, 275, 508 N.E.2d 202.) However, every mention of a victim's family does not *per se* entitle a defendant to a new trial, and in certain instances, such statements can be harmless. *Hope,* 116 Ill. 2d at 276.

In this case, the victim's sister, who was the State's "life and death" witness, testified that the victim was portrayed in a photograph with his son. In this context, the mention of the victim's son was incidental to the life and death testimony of the victim's sister. We judge that it was not presented in a manner that would have led the jury to believe that it was material to defendant's guilt. (*Hope,* 116 Ill. 2d at 276.) Accordingly, we conclude that the reference to the victim's son was not prejudicial.

Defendant next contends that he was denied a fair trial by the prosecutor's misconduct during the trial and in closing and rebuttal argument. The first error cited by defendant occurred during the State's direct examination of Detective Szudarski. Defendant claims that the State elicited testimony from Szudarski which was deliber-

ately designed to mislead the jury to believe that the State did not know where Tommorrah Dukes was located.

■ Szudarski's testimony was elicited by Assistant State's Attorney Erin Jennings on March 9, 1990. He testified that he did not know where she was at that time and that she had not been at any of her last known addresses. On March 13, 1990, defense counsel represented to the court that he had spoken with Tommorrah Dukes and that Dukes had reported to him that she was contacted by the State's Attorney and told that she would be arrested on an outstanding warrant if she appeared in court to testify on defendant's behalf. Defense counsel then moved for a mistrial and for the appointment of a special prosecutor. The trial judge denied the mistrial and the appointment of a special prosecutor but asked Assistant State's Attorney Thomas Epach to respond to the allegations. Epach stated:

> "I would indicate to this court that I have been looking for Miss Dukes. That our attempts to locate Miss Dukes have been continuous throughout the pendency of this case.
>
> I, in fact, went to her home on Sunday evening, and that she was not in. *** I was able to finally contact her last night via a phone conversation."

Defendant claims that the jury was misled to believe that the State was unable to locate Dukes and that this misrepresentation was revealed by Epach's admission that he had spoken to Dukes the previous night. However, the testimony that Dukes could not be located was presented on March 9, 1990, and Epach's testimony that he had contacted Dukes the previous night was not until March 13, 1990. Therefore, we find no evidence that the State misrepresented their inability to locate Dukes.

■ Defendant also alleges that the State threatened Dukes with arrest in order to prevent her appearance in court to testify on defendant's behalf. When defense counsel informed the court of this allegation at defendant's second trial, Epach was given an opportunity to respond. In addition to Epach's statements quoted above, he also stated that Miss Dukes told him that she was not given a subpoena and was told by the former defense counsel that she did not have to testify any further. She also told Epach that she did not wish to testify. Epach further stated that Dukes was aware of the outstanding warrant for her arrest prior to his telephone conversation with her the previous night, and she told him that she had already been in contact with her probation officer concerning the warrant. Epach then stated:

"I don't resort to threats to scare away defense witnesses, as this court knows, where a witness has, in fact, identified Larry Brown to police officers within minutes of the crime, as Tamara [sic] has, in fact, testified in a prior trial. Much could be gained by cross-examining her on that point."

Following defendant's second trial, a motion for a new trial was again filed. At the hearing on this motion, Tommorrah Dukes testified that the assistant State's Attorney had called her the night before the second trial and told her that she would be arrested if she came to court the next day to testify. At the conclusion of the hearing, the trial court made the finding that the State had done nothing to prevent the appearance of Dukes, and that "she's decidedly a pathological liar whose testimony at any juncture in the course of this litigation was worthless."

The trial court's determination regarding the credibility of a witness should not be disturbed on review unless it is erroneous. (*People v. Johnson* (1986), 114 Ill. 2d 170, 190, 499 N.E.2d 1355.) In this case, the trial court had ample opportunity to observe Dukes' demeanor and determine her credibility. Additionally, the trial court was aware of Dukes' testimony at the first trial. We thus conclude that there is no reason to disturb the trial court's finding that the allegations of prosecutorial misconduct were without merit.

Defendant next argues that the State made comments in opening, closing and rebuttal argument which were prejudicial. Defendant cites as error the State's comments in rebuttal that defendant had failed to present expert testimony on the theory of "blowback" and gunshot residue which defendant claims created an inference that such testimony would have been unfavorable to defendant.

■ In this case, the State presented the expert testimony of Dr. Mitra Kalelkar that there was little blood splattering when a handgun was fired into a person's head at close range. In closing argument defense counsel stated:

"She talked about splatter. I apologize for bringing this up, but on this picture you can see splatter. Now that's on his coat. It's on his arm. It didn't ooze onto his arm. It flew up, out, and onto him."

In rebuttal the prosecutor stated:

"How many times did he have to ask Doctor Kalelkar the question about the blood? Take a look at the photograph. Is there blood splatter? Is there blood over here, blood over here, blood up here, down there? Does blood just plop out and on to something? The photograph says no, and you know what? The ex-

pert says, no, and if there was an expert in Cook County you would have heard because they have subpoena powers, and they could have gotten on the stand and said, I am an expert here in Chicago. *** I say the science of blowback indicates that the coat would have been drenched in blood. But no such expert exists in the County of Cook for the City of Chicago *** or you would have heard about it. There's no blowback in this case. There's no blood on that, same thing with this mystical science of gunshot residue."

It is unclear from the arguments presented in both parties' briefs whether they are disputing the testimony of the State's expert as to when splattering occurs or whether they are disputing the presence of splattering on the coat allegedly worn by defendant. However, based on our review of the statements made by both defense counsel and the prosecutor, we conclude that the prosecutor's comments did not constitute reversible error.

We first note that a prosecutor has wide latitude to comment on evidence and draw reasonable inferences therefrom and that, absent a clear abuse of discretion, a court's ruling on the propriety of these comments will not be disturbed on review. (*People v. Rockman* (1986), 144 Ill. App. 3d 801, 813, 494 N.E.2d 688.) Furthermore, it is proper for a prosecutor to comment on the fact that pieces of evidence stand undenied or unexplained. (*People v. Eagle* (1979), 76 Ill. App. 3d 427, 435, 395 N.E.2d 155.) In *Eagle*, the court stated:

" '[I]t is our conclusion that though failure to call a witness or produce evidence may not be relied on as substantial proof of the charge, nonetheless, if other evidence tends to prove the guilt of a defendant and he fails to bring in evidence within his control in explanation or refutation, his omission to do so is a circumstance entitled to some weight in the minds of the jury, and, as such, is a legitimate subject of comment by the prosecution.' " (*Eagle*, 76 Ill. App. 3d at 435, quoting *People v. Williams* (1968), 40 Ill. 2d 522, 529, 240 N.E.2d 645.)

We also find that the prosecutor's comments were proper because they were invited by defense counsel's statements in closing argument. *People v. Johnson* (1986), 114 Ill. 2d 170, 201, 499 N.E.2d 1355.

Defendant next argues that the prosecutor made comments to the jury which suggested that defendant failed to call potential alibi witnesses. Generally, it is improper for the prosecution to comment on defendant's failure to present witnesses when such witnesses are equally accessible to both parties. (*People v. Eddington* (1984), 129 Ill. App. 3d 745, 777, 473 N.E.2d 103; *People v. Popely* (1976), 36 Ill.

App. 3d 828, 836, 345 N.E.2d 125.) However, an exception exists where potential alibi witnesses are interjected into the case by defendant but are not produced by defendant at trial. (*Eddington*, 129 Ill. App. 3d at 777; *People v. Anthony* (1976), 41 Ill. App. 3d 1025, 1032, 355 N.E.2d 218.) However, this exception is inapplicable where the existence of the potential witness is elicited from a defense witness on cross-examination or is interjected into the case through witnesses for the State. *Eddington*, 129 Ill. App. 3d at 777; *People v. Olejniczak* (1979), 73 Ill. App. 3d 112, 123, 390 N.E.2d 1339; *People v. Mays* (1972), 3 Ill. App. 3d 512, 516, 277 N.E.2d 547.

■ Two of the potential alibi witnesses that the prosecutor mentioned in closing argument were introduced by defendant during direct examination. Defendant referred to both Virgil Brown and Pat Dorsey's mother as people who could potentially substantiate his alibi defense. Therefore, pursuant to the ruling in *Eddington*, the prosecutor's comments that defendant failed to produce these witnesses was not improper. However, Pat Dorsey's sister was not mentioned by defendant until cross-examination. As the court in *People v. Olejniczak* stated:

> "[W]hen such potential witnesses are elicited from defendant on cross-examination, 'the responsibility for the failure of the defendant to produce such witnesses can not be assessed against the defendant or [have] the same significance as when defendant himself refers to such potetial witnesses in an apparent attempt to bolster his defense.' " (*Olejniczak*, 73 Ill. App. 3d at 123, quoting *Mays*, 3 Ill. App. 3d at 516.)

This rule prohibits the State from commenting on defendant's failure to produce a potential alibi witness where defendant himself has not introduced the witness during his direct examination (but see *People v. Talley* (1987), 152 Ill. App. 3d 971, 985, 504 N.E.2d 1318). We thus conclude that the prosecutor's comments regarding defendant's failure to call Pat Dorsey's sister as an alibi witness were improper. However, any error that may have occurred was harmless in light of the other evidence of defendant's guilt. (*Talley*, 152 Ill. App. 3d at 984-85.) This evidence consisted of Vernon Williams' graphic and detailed testimony as to how defendant shot the victim, defendant's pretrial testimony that he shot the victim in self-defense which was contradicted by trial testimony that he did not shoot the victim as well as the physical evidence that the victim had been shot in the back of the head, defendant's flight from the scene of the shooting, and lastly, his apprehension 10 months later with false identification.

●■ Defendant also argues that the prosecutor's comments regarding defendant's post-arrest silence was error. Based on our conclusion that the testimony regarding defendant's failure to respond to Cummings' question was properly admitted evidence, it was also proper for the prosecutor to comment on this evidence and all legitimate inferences. *People v. Harris* (1989), 187 Ill. App. 3d 832, 841-42, 543 N.E.2d 859.

●■ Finally, in his argument regarding the allegedly prejudicial references to the victim's three-year-old son by the State's life and death witness, defendant also argues that the prosecutor's references to the victim's son in opening and closing argument was also prejudicial. However, we conclude that the prosecutor's closing rebuttal comments were invited by defense counsel's comments in closing argument that the State's case was "puffed a little bit" by the photograph of the victim's son. (See *People v. Johnson* (1986), 114 Ill. 2d 170, 201, 499 N.E.2d 1355; *People v. Adams* (1982), 106 Ill. App. 3d 467, 474, 435 N.E.2d 1203.) Furthermore, pursuant to our discussion above, we conclude that any error that may have occurred was harmless in view of the other evidence of defendant's guilt.

Defendant next contends that the trial court erred in refusing to give the jury the voluntary manslaughter instruction because the evidence presented at the trial by both the State's eyewitness and defendant that the victim was shot following an argument between the victim and defendant was sufficient evidence for the court to give this instruction. A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden intense passion resulting from serious provocation which is conduct sufficient to excite an intense passion in a reasonable person, or an unreasonable subjective belief that he is justified in the use of deadly force. (Ill. Rev. Stat. 1985, ch. 38, par. 9—2.) Whether a jury instruction on voluntary manslaughter should be given is within the sound discretion of the trial court, and any error in giving or refusing an instruction does not require reversal when the evidence supporting the conviction is clear and convincing. (*People v. Austin* (1989), 133 Ill. 2d 118, 124, 549 N.E.2d 331.) Defendant has the burden of proving that there is at least some evidence of serious provocation to warrant the giving of an instruction. (*Austin*, 133 Ill. 2d at 125.) Evidence of mutual combat or a physical struggle entered into willingly by both parties is sufficient provocation to require a voluntary manslaughter instruction (*Austin*, 133 Ill. 2d at 125), but mere words are not sufficient to show provocation. *People v. Chevalier* (1989), 131 Ill. 2d 66, 71, 544 N.E.2d 942.

●■ At the trial, Vernon Williams testified that defendant told the victim to come downstairs and he would kill him. Defendant testified that he had a verbal argument with the victim and left the premises. Neither version would support an instruction for voluntary manslaughter based on provocation. Defendant also argues that the evidence supported the tender of the instruction based on his unreasonable belief that the use of deadly force was necessary for his self-defense. The evidence defendant cites in support of this theory are his pretrial statements to the police and assistant State's Attorney that he shot the victim in self-defense. However, at the trial defendant denied shooting the victim and claimed that he had been tricked into giving the pretrial statement by the police. Furthermore, there was no evidence that the victim had a gun, and the fact that he was shot in the back of the head contradicts any argument that defendant had even an unreasonable belief that the use of deadly force was justified. Therefore, we find no error in the trial court's refusal to give the voluntary manslaughter instruction.

Finally, defendant contends that he was prejudiced by a witness' comments regarding the safety of his family and by the trial judge's response that the witness had a valid concern because the comments in the jury's presence were so inflammatory that defendant's right to a fair trial was denied.

●■ The comments referred to by defendant were made by Vernon Williams subsequent to his trial testimony. Williams told the trial judge that he was afraid of his family being harmed. After sustaining defense counsel's objection, the trial judge told the witness not to be concerned. He then denied a motion by defense counsel for a mistrial and stated:

> "The statement is baseless and but otherwise innocuous. I don't mean that the witness doesn't have a valid concern, but there's no reason, and I'm sure the Jury would understand that there's no reason for him to express such concern here."

In admonishing the jury to "completely disregard" Williams' statements regarding concern for his family's safety, the judge also told the jury that the statement was "something off the top of the gentleman's head that is so far as we all know is entirely baseless and has nothing whatsoever to do with this case."

Where an objection to an error is sustained, and the trial judge acts to cure the error by admonishing the jury to disregard it, any alleged error is negated. (*People v. Baptist* (1979), 76 Ill. 2d 19, 30, 389 N.E.2d 1200.) In this case, the trial judge sustained defense counsel's

objection and sufficiently admonished the jury. Thus any potential error was negated.

For the reasons discussed above, the judgment of the circuit court is affirmed.

Affirmed.

McNAMARA and EGAN, JJ., concur.