THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THOMAS LAWRENCE, Defendant-Appellant.

Second District No. 2—92—0454

Opinion filed March 29, 1994.

G. Joseph Weller and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers, Mary Beth Burns, and Cynthia N. Schneider, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE PECCARELLI delivered the opinion of the court:

Defendant, Thomas Lawrence, was found guilty by a jury of aggravated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(a)(2) (now 720 ILCS 5/12—14(a)(2) (West 1992))) and sentenced to six years' imprisonment. Defendant appeals, contending: (1) that the prosecutor's closing argument, wherein he referred to defendant's failure to call potential alibi witnesses, substantially prejudiced defendant and denied him a fair trial; (2) that the prosecutor's post-trial reference to a polygraph test prejudiced the trial court's consideration of defendant's post-trial motions; and (3) that the complainant's identification testimony was insufficient to convince a rational jury that defendant was guilty beyond a reasonable doubt.

At trial, the complainant, Michele Luhman, testified that she had

been raped by defendant on September 11, 1991, at the Inn Town Motel in Rockford where she was temporarily residing with her children, Michael, five years old, and Melissa, three years old. Prior to the rape, Luhman had seen defendant on two prior occasions. On the previous Friday, the day she moved into the motel, defendant had attempted to assist her in unlocking her motel room door, which would not open. Defendant was unsuccessful, and Luhman asked the maintenance man to assist her. Luhman did not recall the exact date of her second encounter with defendant. On that occasion, she and a male friend were standing outside the motel when defendant approached with a pizza and some pop. Defendant dropped some of the pop cans, and Luhman picked them up and handed them to defendant. Defendant would later testify that this second encounter occurred early in the evening preceding the date of the alleged attack.

On the date of the rape, Luhman went to sleep at about 9 or 9:30 p.m. She had turned off the lights and was sleeping in the same bed as her son; her daughter was sleeping in the other bed in the room. At about 11:30 p.m. she was awakened by a knock at the door. Luhman turned on the lamp by the door and looked out the peephole in the door. She saw a lady whom Luhman was planning on driving to work the next day. Luhman opened the door and spoke with the woman, confirming that she intended to give the woman a ride in the morning. Luhman locked the door and went back to bed.

Approximately one-half hour or 45 minutes later, Luhman was awakened by another knock at her door. Luhman stated that she was still slightly awake. She grabbed something to throw around herself, as she had been sleeping in nylons and a top. Luhman recalled that she turned on the lamp on the table by the door and looked through the peephole. The florescent lights in the hallway, one of which was about a foot from her door, made the hallway "quite bright." Through the peephole, Luhman saw the man who had assisted her with her lock and whom she had helped with the pop cans. He was wearing a black top and dark, but not black, pants.

Luhman said that she was "kind of sleepy" and "groggy" so she opened the door with the chain on and looked out to see if the person was the individual she thought he was. According to Luhman, the man was mumbling but said something about hotel business. Luhman could not comprehend what he was saying and feared that something was wrong in the hotel so she opened her door. Luhman stated that she was standing behind the door when she smelled the odor of alcohol on the man's breath and became worried. Luhman testified that the man walked into her room, shut the door, and proceeded to lock it. Luhman, who said that she was still not wide

awake, woke up "real quick" when he locked the door. Luhman recalled that she moved away from the door, looked toward the window, and started screaming. According to Luhman, the man grabbed her and put his hand over her mouth. She could not recall if he was behind her or in front of her when he covered her mouth. She did recall that she tried to bite him while his hand was covering her mouth. She did not know whether she was successful but was 90% certain that she had bitten him.

Luhman stated that the man threw her down between the two beds, that she hit her head on the frame of one of the beds, and that she felt pain. Luhman testified that she did not know whether she fainted or passed out momentarily because she did not remember how she ended up on top of the bed.

Luhman said that the man had his pants off. She described the pants as "dress type jeans—dress type pants." They were not sweat pants, and they were not made of a bright, shiny, nylon-type material. She did not notice if the pants had an elastic band or a zipper but they were the kind of pants "you really have to pull *** to get them up."

Luhman recounted that the man pulled down her nylons and tried to stick his penis in her vagina. Luhman stated that she wanted to scream, but he told her to shut up or he would slit her throat. Because of that threat and the fact that she feared for her children's safety, she did not scream. The man could not get an erection so he tried to get Luhman to masturbate him or to put his penis in her mouth. She refused to do either. The man tried again to insert his penis in Luhman's vagina. When he failed, he shoved his fingers up her vagina so far that she experienced excruciating pain. At the time of the attack Luhman was menstruating and was wearing a tampon. Luhman testified that during the attack she was on her back for 10 to 15 minutes, looking at the man's face nearly the whole time.

During the attack, Luhman's daughter awoke. Luhman pleaded with her attacker to stop and leave. The man agreed to leave and began getting dressed. He told Luhman that if she told anyone what had happened, he would return.

After the man left, Luhman hid in the corner of her room for awhile because she was afraid he would return. Then, she grabbed the phone and called an elder from her church. She told him that a man had tried to rape her. The elder advised her to call the police. Luhman stated that she was afraid to call the police because she thought the man would return and hurt her. Instead, she telephoned her father at work. Her father tried calming her over the phone while also notifying the police.

Two police officers arrived at Luhman's room while she was still talking to her father. Luhman recalled that she related to the officers what had happened to her. She described her attacker, stating that he was a black man wearing dress pants and a black shirt. Luhman acknowledged that she described the shirt as long-sleeved although she really was not certain whether it was long-sleeved or short-sleeved because she was concentrating on defendant's face during the attack. Luhman explained that if a black man is wearing a black shirt and if one is fearing for her life at the time, "how can you tell if it's long or short [sleeved]?" Luhman was shown a photograph of defendant taken on the date of the attack and asked, "[Y]ou couldn't tell the difference between his skin color and t-shirt [sic] [he was wearing]?" The photograph showed that defendant was light-skinned and wearing a short-sleeved black T-shirt and gray pants. Luhman responded that she was not paying attention to what defendant was wearing. She was concentrating on his face as well as on getting away from him and getting him out of her room. Luhman acknowledged that she did not notice a mustache on her attacker. The photograph of defendant revealed that he had a mustache.

Luhman testified that she told the police that she had encountered her attacker on two prior occasions and that she thought he lived in the motel. The police asked her where she thought the attacker might be and then proceeded to look for him. The officers returned within 10 to 15 minutes with defendant. One officer told her that they had found someone who fit the description of her attacker and asked her to look at him through the peephole in her door. She looked through the peephole and identified defendant as her attacker. Because the officers were not certain that Luhman could see clearly through the peephole, they told her to leave the chain on her door and open it so she could see out into the hallway. Luhman opened the door about five inches, looked out, and confirmed that defendant was the man who attacked her.

On the date of the attack, Luhman was taken to the hospital. According to Luhman, she had incurred several cuts inside her vagina as a result of the attack on her. When asked if the hospital had sutured or fixed these lacerations, Luhman replied, "They took care of what was necessary." Luhman was then taken to the Rockford police department where she gave a statement to the police.

Officer Erik Swenson of the Rockford police department testified that on September 11, 1991, he responded to a report of an attempted rape in room 226 at the Inn Town Motel. The officer did not testify as to the time of the call from the police dispatcher or the time of his arrival at the motel. When he arrived, the victim, Luhman, who was

crying and shaking, said a man had assaulted her and had left about 15 minutes earlier. Luhman described her attacker as a black male, between 25 and 30 years old, 6 feet tall, with a big muscular build, and wearing a black shirt and dark dress pants. Luhman told the officer that she had smelled alcohol on the attacker's breath. Luhman also told Swenson that she had seen her attacker on two prior occasions and that she believed he lived in the motel.

When Officers Kevin Ogden and Larry Foster arrived, Swenson gave them the description of Luhman's attacker and instructed them to investigate several rooms down the hallway, as Luhman thought the attacker had friends who had rooms on that floor. Ogden and Foster left to look for the suspect while Swenson stayed with the victim to gather more details.

Swenson stayed in radio contact with Officers Ogden and Foster. Within a short time, one of them contacted him and asked him to step out into the hallway. Standing in the hallway with the officers was a black male, the defendant, who matched, "very closely," the description Luhman had given Swenson. When the officer asked defendant to breathe in the officer's face, he detected an odor of alcohol. Swenson testified that he reentered Luhman's room and told her that the officers had an individual at whom Swenson wanted her to look. Swenson did not tell Luhman that the officers had caught the person who had attacked her.

Swenson recalled that he asked Luhman to look through the peephole in her door. He felt a face-to-face confrontation would upset her further. Swenson first looked through the peephole to determine if the person on the other side of the door could be seen clearly, and then he had Luhman look through the peephole. Luhman identified the defendant as her attacker.

Swenson related that when his sergeant arrived at the motel, the sergeant decided that Luhman's door should be opened a few inches to allow her to get a clearer view of the suspect standing in the hallway. Luhman looked out the door for three or four seconds and again identified defendant as her assaulter.

On cross-examination, Swenson related that Luhman told him that she had attempted to bite defendant's hand when it was covering her mouth. She did not know if the bite left a mark or injured defendant's hand. Swenson acknowledged that a statement in his written report, particularly reciting that Luhman bit her attacker on the hand causing a small cut to the finger, was added after another officer told Swenson that defendant had a small cut on one of his fingers.

Officer Kevin Ogden testified that he went to the Inn Town Motel

on September 11, 1991, to act as a backup unit for Officer Swenson. Swenson gave Ogden a description of a suspect he was looking for in a sexual assault. Ogden proceeded down the hallway of the motel with Officer Foster. The two officers saw a black male enter the hallway from a room. They asked him if he had seen anybody matching the description of the suspect. He replied negatively. They also asked him if there was anyone else inside the room he had just exited. He said that everyone was sleeping.

Ogden stated that the door to the room was partially open and that he thought he could see, through the opening between the door and the door frame, somebody standing behind the door. Ogden also noticed smoke coming out from behind the door. The officer told the person behind the door to come out, but the person did not comply with the officer's order. Eventually, defendant walked out from behind the door. Defendant gave Ogden his name and told the officer he lived in room 316.

Officer Ogden recalled that he asked defendant to accompany him down the hall because he felt defendant matched the description he had been given by Swenson. Defendant said, "No problem," and walked down the hall to Luhman's room with the officers. Ogden stated that he did not take the names of any of the other individuals in the room where he discovered defendant because none of them matched the description of Luhman's attacker.

On cross-examination, Ogden acknowledged that while he and Officer Foster were standing in the hallway with defendant, the officers saw another person at the end of the hallway. That individual looked into the hallway, noticed the officers, closed the hallway door, and "went we don't know where." Ogden stated that Foster went down the hallway to look for that person but did not see anybody. Ogden said he did not know if that person was a black male.

Eugene Koelker, an investigator for the Rockford police department, recounted that he went to Luhman's room on September 11, 1991, to collect evidence. Koelker first spoke with Luhman and then made a diagram and took photographs of the room. Koelker explained that he did not take any fingerprints because, from speaking with Luhman, he ascertained that nothing had been touched by defendant from which fingerprints could be recovered. The officer took the bedspread and pillow case but did not obtain any relevant evidence from them. He did not find any blood or stains.

Koelker stated that he took photographs of defendant showing the way he was dressed on the night of his arrest. He also took photographs of defendant's hands. The witness identified a photograph of defendant's right hand showing a very small cut by the

cuticle of the index finger. The cut did not appear to be a puncture-type wound. Koelker did not recall whether there was a scab on the cut. He did remember that the cut was not bleeding at the time he took the photograph although there was dried blood along the ridge of the fingernail.

Detective Bruce Scott of the violent crimes division of the Rockford police department testified that he interviewed defendant at about 3:50 a.m. on September 11, 1991. At that time the officer informed defendant that a woman was alleging that defendant had sexually attacked her. Scott stated that defendant's response to the officer's statement was: "[W]hat would stop me from having sex with a woman if I wanted to have sex with her?" Scott told defendant that he was going to talk with the woman making the allegations, and then he would talk to defendant again.

At about 5:20 a.m. Scott and another detective interviewed defendant after advising him of his *Miranda* rights and obtaining defendant's waiver of those rights. Defendant acknowledged that he knew the woman who had made the charges against him because he had helped her try to get into her room on one occasion. Also, defendant said he had seen her earlier that evening (September 10) when he dropped some pop, and she had helped him with it.

Scott related to defendant that the woman had accused him of forcing sex on her. The officer recalled that defendant completely denied the accusation, stating that he had been with three other individuals, Pierre McBride, Mark Standfield, and Kevin Standfield, for an hour before the police took him to the police station. According to Scott, he later spoke with these three men. Scott testified that the three men did not provide a statement consistent with defendant's. Defendant objected to this testimony on the basis of hearsay. The court sustained defendant's objection and asked the jury to disregard the testimony. Later, on cross-examination, defense counsel asked the officer if he was able to tell whether "these people back at the motel" were being truthful or were lying. The officer replied, "No, I have no idea." On redirect examination, Scott testified that the statements of two of the men were consistent. The third individual indicated that he did not know what had happened during the time in question. The officer acknowledged that it was possible that the two men giving consistent statements could have been lying but it was less likely that two people with consistent statements would both be lying.

Also, on cross-examination, Scott acknowledged that he did not recall everything that was said during the half-hour interrogation of defendant at the police department. He related that he did not take a

written statement from defendant because defendant's comments were few and not detailed. Scott described defendant's demeanor during the interrogation process as "exceptionally calm."

Officer Larry Foster of the Rockford police department was called to testify on defendant's behalf. Foster recalled that on September 11, 1991, he was in the hallway of the Inn Town Motel when Officer Ogden came out of one of the rooms with defendant. At that time Foster noticed a person partially open the doorway at the northern end of the hallway, a distance of about 150 feet away. Foster recounted that the individual looked at the officers and then turned around and left. Foster said that he proceeded "at a pace" down the hallway to locate this individual because he acted suspiciously. The officer described the person as a stocky, black male wearing a long-sleeved black, sweatsuit-type jacket and black sweatpants. By the time the officer got to the spot where he had seen this individual, the individual had vanished.

On cross-examination, Officer Foster related that the individual he saw at the end of the hallway was approximately 5 feet 8 inches tall and dark-skinned. The officer stated that he would characterize defendant as light-skinned. Foster said that he believed the other individual was wearing sweatpants because the pants were baggy and had elastic at the bottom of them. The pants were not dress pants.

Defendant, Thomas Lawrence, testified that on Wednesday, September 11, 1991, he was living in room 316 at the Inn Town Motel. Defendant stated that on the previous Friday Michele Luhman had asked him to assist her in opening her room door. Defendant made an attempt to open it but then advised her that the maintenance man lived next door to her. Defendant left.

On the following Tuesday evening (September 10) defendant was carrying a pizza and some pop into the motel. Defendant recalled that he dropped a couple of the cans of pop and Luhman, who was standing outside with a man, picked up the pop cans and gave them to defendant. Defendant went to his room to eat the pizza. Because he could not eat all of it, he went downstairs to room 210 and offered some of the pizza to Pierre McBride and Kevin and Mark Standfield. After Pierre and Mark ate some pizza, defendant returned to his room.

According to defendant, a friend named "Andrew" came to visit him in his room at about 10 p.m. Andrew, whose last name defendant did not know, brought some beer with him. The two men watched TV, talked, and drank beer. Then, they went to an Amoco station to get some gas. Neither defendant nor Andrew had any money so defendant tried to cash a check at the station. The station

attendant would not cash the check because defendant did not have an Amoco charge card. Defendant saw an acquaintance, James Wiley, at the station. Defendant tried to borrow $10 from Wiley; Wiley gave him $5. Defendant gave the money to Andrew for gas.

Defendant testified that he and Andrew drove around for a couple of minutes, and then Andrew dropped him off at the motel. Defendant went to Mark Standfield's room, room 307, to ask Mark if he would give defendant a few dollars. Mark indicated that he had no change and suggested that the two of them go to Kevin Standfield's room, room 210. When they arrived at room 210, Kevin was in bed, and Pierre McBride was in the room. Defendant stated that he was uncertain of the time at this point. He knew it was after 12 o'clock because Wiley, whom he had seen at the gas station, worked the second shift at the Chrysler plant, which ended at midnight.

Defendant recounted that when the police came into Kevin Standfield's room, defendant was using the bathroom. As defendant came out of the bathroom, he heard Mark Standfield talking to somebody at the door. The officer speaking with Mark asked defendant to step out in front of the door, and defendant complied with his request. The officer told defendant that an assault had occurred in the motel and that defendant matched the description of the attacker. The officer asked defendant if he committed the assault, and defendant replied negatively.

The defendant recalled that while the police were talking to him in the hallway, another black man came around the corner of the hallway, saw the police officers, and ran. One officer chased after the man but lost him.

According to defendant, the police handcuffed him and took him to Luhman's room to see if she could identify him. The officers had defendant stand in front of the door so Luhman could look out of the peephole at defendant. They also opened the door a small distance. Afterwards, the police took defendant to the police station.

At the station Officer Scott told defendant that Luhman was at the hospital and that after he got a statement from her, he would talk with defendant. Defendant told Scott that he had "pretty much been" in his room that evening. Scott did not ask defendant if he had left the motel. Later, Scott and another officer interviewed defendant. Defendant told the officers about the two occasions on which he had encountered Luhman. Defendant recalled that he could not believe Luhman had accused him of attacking her.

Defendant identified the photographs of his right hand and pointed out a hangnail on the inside nail of his index finger. Defendant said the police never asked about the hangnail.

Defendant denied that he had ever been in Luhman's room or that he had attacked and raped her.

On cross-examination, defendant admitted that he did not know where his friend Andrew was living, that he did not attempt to have anyone locate Andrew, and that he did not mention Andrew's name to the police. Defendant acknowledged that although he had spent several hours with Andrew and only about 45 minutes with McBride and the Standfields, he had only told the police about the latter incident. Defendant said that the officers had only asked him where he had been in the motel. They did not ask him if he had gone out.

Defendant was again shown the photograph of his right hand. Defendant denied that the photo showed a cut on the skin extending a quarter of an inch away from the nail of his index finger. Defendant said that the cut looked like it was on the inside of the nail. He did acknowledge that the photo showed blood running alongside the nail. Defendant could not recall when the cut occurred but stated that it resulted from the top portion of the cuticle being pulled off by him.

Following deliberations, the jury found defendant guilty of aggravated criminal sexual assault. The trial court, subsequently, denied defendant's post-trial motions and sentenced him to a minimum term of six years' imprisonment. This appeal ensued.

Defendant first contends that he was denied a fair trial when the prosecutor, during his closing argument, referred to defendant's failure to call potential alibi witnesses. The prosecutor told the jury:

"Then he [the defendant] tells the officer that he was with Pierre McBride and Mark Standfield, but you didn't see them coming in here and testifying and backing him up.

[Defense Counsel]: Objection, your Honor.

THE COURT: Objection sustained."

Generally, it is improper for the prosecutor to comment on a defendant's failure to present witnesses when such witnesses are equally accessible to both parties. (*People v. Brown* (1991), 222 Ill. App. 3d 703, 718.) An exception to this general rule exists when potential alibi witnesses are interjected into the case by defendant but are not produced by defendant at trial. (222 Ill. App. 3d at 719.) This exception, however, is inapplicable when the existence of potential witnesses is interjected into the case through the State's witnesses. *People v. Eddington* (1984), 129 Ill. App. 3d 745, 777.

In the instant case, the fact that potential alibi witnesses were listed in defendant's discovery answers did not, as defendant points out, establish that they were more accessible to the defense than to the prosecution. As defense counsel argued below, efforts to subpoena

Pierre McBride were fruitless because the address given for McBride was incorrect. Thus, he was not accessible to either side. Mark Standfield, the other potential alibi witness named by the prosecutor in his closing argument, was a convicted rapist. Although he was accessible to both sides, any credibility he might have had as a witness on defendant's behalf was questionable due to his conviction.

The existence of potential alibi witnesses was interjected into the case through the State's own witness, Detective Bruce Scott. Moreover, in examining Scott regarding these witnesses, the prosecutor specifically characterized the individuals as "alibi" witnesses.

From the moment defendant was advised by the police of the charge against him, he denied committing the assault in question. His theory of defense was that he was elsewhere at the time of the attack, which could have occurred any time between midnight and 12:30 a.m. by the complainant's recollection, and that another black individual may have committed the assault. Because McBride could not be found and Mark Standfield's value as a credible witness was doubtful, defendant called upon James Wiley to establish that defendant was at an Amoco gas station with another individual named Andrew sometime after midnight on the date in question. Wiley worked the 3:30 p.m. to midnight shift at the Chrysler plant in Belvidere. Wiley's testimony was intended to show that after he got off work on the date of the attack, he had seen defendant at the Amoco station and lent him $5 for gas, thereby placing defendant at someplace other than the Inn Town Motel after midnight. Although Wiley acknowledged that his encounter with defendant occurred in September 1991, his testimony was stricken because he could not recall the exact date on which they met.

The only other defense witness, besides defendant himself, was Officer Larry Foster, who substantiated defendant's testimony that at the time defendant was in the hallway with Foster and Officer Kevin Ogden another black man started to enter the hallway, saw the police, and then turned around and left. Foster testified that he proceeded down the hallway "at a pace" to catch the individual because, in the officer's words, the man "acted suspicious[ly]." However, when Foster got to the location where he had seen this individual, the individual had disappeared. Nevertheless, the officer acknowledged on cross-examination that the individual was shorter and darker-skinned than defendant, that he was dressed in a black sweatsuit jacket and black sweatpants, not dress pants, and that he did not know why the person had turned and disappeared.

Given the facts that the substance of defendant's defense was his contention that he was somewhere else at the time of the assault and

that Wiley's testimony was stricken, the prosecutor's reference to the absence of testimony by McBride and Mark Standfield to further support defendant's contention was improper. A defendant is not bound to produce any witnesses, and when he does not testify to any attempt on his part to secure witnesses or as to his failure to secure them, as was the situation here, it is error to comment on his failure to do so. *People v. Saunders* (1984), 122 Ill. App. 3d 922, 932.

The State maintains that any error was cured when the court sustained defendant's objection and later instructed the jury that opening and closing arguments are not evidence, that the State carries the burden of proof, and that the defendant is presumed innocent. Additionally, the State asserts that the defendant's authorities do not support his proposition that the allegedly improper statement cannot be cured. Conversely, one of the two cases to which the State refers does support defendant's claim that the prosecutor's remarks substantially prejudiced defendant's case.

In *People v. Eddington* (1984), 129 Ill. App. 3d 745, as in the instant case, the only evidence pertaining to potential alibi witnesses was elicited by the prosecution from its own witness, a detective with the sheriff's department. Also, as is in the case at bar, the prosecutor in *Eddington* during closing argument commented on defendant's failure to call the potential alibi witnesses. The prosecutor stated:

> " 'Ask yourselves again what evidence is probative and should be considered very heavily and you can decide one way or the other. Remember the defendant's statement. He says he is with Bagley and Hill and they run into three more people, they run into Tom Smith, Don Hurt, and Kevin Case. If they ran into three people, where are they to take the stand and tell you that?
> [Defense counsel]: Your Honor, I object to that.
> THE COURT: Overruled.
> [Prosecutor]: They would be in here telling you that if in fact he had been with Bob Bagley and Jim Hill and that happened. It didn't happen.' " *Eddington*, 129 Ill. App. 3d at 777.

The *Eddington* court found that the prosecutor's remark constituted reversible error. The State, in the instant case, concludes that the court's ruling in *Eddington* was based on the fact that defendant's objection was not sustained and that the State, in *Eddington*, relied only on the instruction pertaining to closing argument to argue that the remark had been cured. The State overlooks that the burden of proof instruction was also cited in *Eddington* as curative. As similar instructions were given in the case at bar, the only difference between the instant case and the *Eddington* case is that, here, the trial court sustained defendant's objection to the prosecutor's remark

whereas, there, the court did not. However, under the particular facts and circumstances presented in the instant case and the decision rendered in *Eddington*, we do not find the trial court's sustainment of the prosecutor's remark sufficient to cure the improper remark. As the *Eddington* court so aptly stated:

> "If error of this nature were deemed so easily cured, the prosecution could violate the rule [that it is improper for the prosecution to comment on defendant's failure to present potential alibi witnesses] and argue harmless error in any case." 129 Ill. App. 3d at 777.

Nevertheless, the State argues that the unique facts of the instant case either justified the prosecutor's dubious remarks, or rendered them harmless. The State maintains that defense counsel put before the jury the basis to infer that Pierre McBride and Mark Standfield did not support his alibi and, therefore, the prosecutor's comments regarding the absence of these witnesses were of little significance in affecting the outcome of the case. To support its position, the State relies on testimony which does not, in our view, necessarily lead to the inference the State asserts.

At the time the prosecutor elicited from its own witness, Detective Bruce Scott, that potential alibi witnesses existed, the officer was asked whether he had talked with these individuals. After indicating that he had spoken with them at the motel, the officer was then asked whether the individuals provided statements consistent with the defendant's. The officer replied that they did not, and defendant objected on the basis of hearsay. The court sustained the objection and instructed the jury to disregard the officer's answer. On cross-examination, the officer was asked whether he could tell if "these people back at the motel" were telling him the truth or lying. The officer replied, "I have no idea." On redirect examination, the officer was asked, "Did all three people give you consistent statements?" The officer answered, "Two did and one said he didn't know what happened."

The State argues that, as a result of defense counsel's examination of Officer Scott regarding the truthfulness of defendant's potential alibi witnesses, "the jurors *knew* that the defense believed the witnesses to be liars" and, therefore, the prosecutor's remarks on defendant's failure to call them was harmless. (Emphasis added.)

We, however, believe that this particular line of questioning merely illustrates how prejudicial the prosecutor's closing remark was. If from this line of questioning the jurors inferred, as the State assumes, that the statements of McBride and the Standfields would not support defendant's alibi, then the prosecutor's improper reference to their absence at trial unfairly reinforced that inference.

Improper comments during closing argument are not reversible error unless they constitute a material factor in conviction or result in substantial prejudice to the accused; they are harmless error in the case of overwhelming evidence against defendant. (*People v. Wills* (1986), 151 Ill. App. 3d 418, 423.) The evidence in the instant case was close and amounted, primarily, to the complainant's testimony against the defendant's. While it is the jury's responsibility to weigh the credibility of the witnesses and to resolve any conflicts and inconsistencies in their testimony (*People v. Schott* (1991), 145 Ill. 2d 188, 206), the jury, here, may not have resolved the inconsistencies in the complainant's identification testimony in her favor had the prosecutor not drawn the jury's attention to the absence of defendant's alibi witnesses. The prosecutor's improper comment placed the burden of proof on defendant to prove his innocence and, therefore, could have constituted a material factor in swaying the jury's determination. We conclude that a reversal is warranted in the instant case.

In holding as we do, we find it unnecessary to address defendant's additional appellate contentions. We note, however, that we believe the evidence at trial was sufficient for the jury to conclude that defendant was guilty beyond a reasonable doubt. This does not mean we are making a finding as to defendant's guilt or innocence which would be binding on retrial. Rather, our consideration of the sufficiency of the evidence admitted at trial will remove the risk of subjecting defendant to double jeopardy. *People v. Taylor* (1979), 76 Ill. 2d 289, 309-10.

Defendant's conviction is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

WOODWARD and QUETSCH, JJ., concur.