# Illinois Official Reports

## Appellate Court

*People v. Hoy*, 2017 IL App (1st) 142596

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DELAMONTE HOY, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-14-2596 |
| Filed<br>Rehearing denied | September 11, 2017<br>October 13, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-13472; the Hon. Lawrence E. Flood, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Richard H. McLeese, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Jon Walters, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justices Simon and Mikva concurred in the judgment and opinion. |

**OPINION**

¶ 1        Defendant, Delamonte Hoy, appeals his conviction, after a bench trial, of first degree murder and his sentence of 52 years' imprisonment. On appeal, defendant contends that (1) the trial court should have found him guilty of second degree murder instead of first degree murder, where the evidence showed that defendant had an actual but unreasonable fear of imminent harm, and (2) his sentence of 52 years' imprisonment, which includes a mandatory 25-year firearms enhancement, should be vacated and the case remanded for resentencing because defendant was 16 years old when he committed the offense, and his sentence does not comport with the constitutional or statutory requirements for sentencing juveniles. For the following reasons, we affirm.

¶ 2                                    JURISDICTION

¶ 3        The trial court sentenced defendant on July 31, 2014. Defendant filed his appeal that same day. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Oct. 1, 2010) and 606 (eff. Mar. 20, 2009), governing appeals from a final judgment of conviction in a criminal case entered below.

¶ 4                                    BACKGROUND

¶ 5        On Friday, June 19, 2009, 16-year-old defendant and his longtime friend, 17-year-old James Thomas, were in front of a three-story building on Chicago's west side. A few days before, a friend of both boys had been shot in the neighborhood, so defendant acquired a pistol that he had on him that day. As boys that age are known to do, defendant and James got into a heated verbal argument, which ordinarily would have resulted in hitting or pushing the other and both probably wrestling on the ground to the point of exhaustion, their heated passions drained away. But for the fact that defendant had a gun, what ordinarily should have happened between these boys did not happen. In this heated moment, with the immediate availability of a gun, defendant fatally shot James once in the stomach and twice more as James tried to crawl away. Instead of the boys ending their argument with punches and shoves, defendant reached for his gun and fired shots at James. James died from his injuries, and defendant is now serving a sentence of 52 years' imprisonment for first degree murder.

¶ 6        Defendant was charged with six counts of first degree murder in the shooting death of James. At his bench trial, Catherine Slater testified that on June 19, 2009, she went to visit her parents who lived in the basement apartment at 1338 S. Albany in Chicago. As she was leaving, Catherine observed defendant arguing with James in front of the building. There were also six or seven other people on the porch. The area in front of the house was bordered by a wrought iron fence and a gate. Catherine did not see defendant or James touch each other, and she did not see a weapon initially. She heard defendant say to James, five or six times in a loud voice, "Say it again. Say it again. I'll shoot the s**t out of you." They were standing about a foot apart, facing one another but there was no physical contact. Catherine saw defendant pull a silver revolver from behind his back and shoot James, hitting him twice in the stomach. When James tried to crawl away, defendant shot him four more times in the back. Defendant then ran toward Douglas Boulevard. All of the shots were fired from inside the fence. After he was shot, James lay on the ground inside the wrought iron fenced area.

¶ 7 Catherine identified defendant in a photo array. She stated that, on the day of the shooting, defendant wore his hair in dreadlocks. In the photo array, however, defendant's hair was not in dreadlocks. Catherine also identified defendant in a lineup on June 30, 2009, and at that time, defendant had shaved off almost all of his hair. She did not recall that defendant was wearing a blue hat on the day of the shooting.

¶ 8 Kenneth Slater testified that he lived at 1338 S. Albany on the day of the shooting. When he approached his home on June 19, 2009, around 4:30 p.m., he noticed defendant and James having "words" on the porch. Kenneth knew James from the neighborhood and also knew defendant's father. He heard defendant say, "Say it again" but he did not hear James's response. Kenneth did not see any physical contact between defendant and James, nor did he see either of them with a weapon. Neither defendant nor James wore a hat, and Kenneth did not see bicycles out front. After he went inside, Kenneth heard a pop like a firecracker and then after a pause, about four more pops. He looked out of the plate glass window at the front of the house and saw James lying on the ground inside the yard. He also saw defendant running toward Douglas Boulevard. Renee Johnson and Cordarrell came out to help James.

¶ 9 Two days later, Kenneth identified defendant from a photo array. Kenneth thought that defendant wore his hair in dreadlocks on the day of the shooting, but he did not wear it that way in the lineup photo. Kenneth refused to identify anyone in the lineup on June 30 because he received "a little threat." At trial, Kenneth was shown a photo taken of the lineup and he acknowledged it showed the people in the lineup room that day. He then identified defendant in the lineup photo.

¶ 10 Renee Johnson testified that on June 19, 2009, she was working as a private nurse for Jackie Slater who lived at 1338 S. Albany. Renee knew defendant and James, and thought of both like nephews. When she arrived at 1338 S. Albany that day, around 4:30 p.m., she saw seven or eight people outside on the porch. She observed that defendant and James "were having a verbal conversation" but she did not hear what was said. She clarified that they were having more of an argument than conversation and that defendant's voice was raised more than James's voice. Renee stated that defendant's hair was in dreadlocks at the time, and he was not wearing a hat. Renee testified that while they were arguing, she did not see James or defendant put their hands on each other. She told both of them to stop arguing because "they were better than that."

¶ 11 Renee then went into the building to care for Jackie. While inside, Renee heard two gunshots coming from the front of the building. She then heard "a couple of more shots," and someone came inside and told her that one of her "Godsons got shot" but they did not know who. Renee did not go to the front of the building initially, but instead went to her building to tell defendant's father than defendant had been shot. When she saw defendant's father, she "turned around and told him it wasn't [defendant]." Renee stated that she could not explain it, "but something came over [her]" and she "just knew in [her] heart that it wasn't [defendant] that got shot." When asked who she thought had been shot, Renee answered, "It was James." She ran to the front of 1338 S. Albany and saw James lying in the grass behind the gate. Renee identified defendant in a photo array and lineup. She testified that defendant's hair was different on the day of the shooting than it was in the lineup or photo.

¶ 12 Cordarrell Wilson ("Big C") testified that on June 19, 2009, he was selling drugs to an old man who lived in the basement of 1338 S. Albany. He walked to the front of the building and saw James lying in the grass inside the fence. He did not hear gunshots, nor did he know

- 3 -

whether James was injured. He did not see James with a gun. He stayed with James until the ambulance arrived, and then went to the police station to speak with police. At trial, Cordarrell denied telling police anything about the shooting and stated that the police told him what he knew. Although he acknowledged his handwritten statement, and that he identified photos of James and defendant, he denied making the statements about the shooting. He testified that the police threatened to "put the case on" him and other older men because defendant and James were "juveniles and all that." They told Cordarrell that if he signed his name to the paper, they would let him go "right then and there. That's how [his] signature got on the paper."

¶ 13    Assistant State's Attorney (ASA) William Kelly testified that he took Cordarrell's handwritten statement. In the statement, Cordarrell said that he was hanging out with friends on the 1300 block of S. Albany on June 19, 2009. Defendant and James had been arguing "for awhile," and Cordarrell heard a gunshot and saw defendant shooting. Defendant was pointing his hand down towards the gate. He heard three shots. As he was shooting, defendant was moving toward 13th Street, and after the shots, defendant "was gone." James was lying in front of the house and he appeared to have a wound to his stomach. Cordarrell did not see James with a gun.

¶ 14    Cordarrell initialed corrections and told ASA Kelly, outside the presence of the police, that he had been treated decently. He also stated that no threats or promises were made in exchange for his statement. Cordarrell made substantially the same statement to Detective Ruiz. Cordarrell never stated that he saw defendant and James make physical contact with each other.

¶ 15    The parties stipulated that Dr. Lawrence Cogan from the Cook County Medical Examiner's Office performed an autopsy on James. Dr. Cogan observed a gunshot entrance wound on the right middle back and a gunshot exit wound over the right shoulder. The direction was "front to back, downward and left to right." There was also a penetrating gunshot wound to the abdomen with no exit wound. The right iliac artery was completely severed, resulting in "extensive hemorrhage extending from the right kidney down to the groin." Dr. Cogan also found a penetrating gunshot wound to James' left buttock. The direction appeared to be back to front and downward. He concluded that James died of multiple gunshot wounds and the manner of death was homicide.

¶ 16    Alante Hands testified for the defense. Alante stated that, in 2010, he spoke with defense counsel and Kathleen Schultz. Schultz took a handwritten statement from Alante. In the statement, Alante stated that, on the day of the shooting, defendant teased James, saying that James must have been scared because he had not been seen for three days following an altercation. James raised his fist and kept throwing punches. Alante jumped in to break them apart, and while he was in the middle, a shot fired. While defendant walked away, James shouted, "I'm going to kill this b***as [sic] n***." Defendant turned around and shot James again. Alante heard four or five shots and then saw defendant running. Alante rode away on his bike.

¶ 17    At trial, Alante testified that James approached 1338 S. Albany and tried to get defendant's bicycle. Alante guessed that defendant told James he could not have the bike and that James said something and then slapped defendant's hat. Defendant rode away on the bike to the water fountain. When he returned, James left the porch and walked up to the bike. James poked defendant in the head with his fingers. Defendant laughed, and James pulled out

a cell phone, asking if defendant wanted to fight or shoot because he would make a phone call "and have the whole block[ ] patched up." Alante testified that defendant was ready to ride off on his bike when James "muffed" him on the back of his head. Defendant turned the bike around. He was "mad because he wasn't laughing no more." He told James to stop touching him, and James "smacked his hat off his head." Alante tried to get between them but, before doing so, he heard shots fired. He saw James "goin[g] down" and "grabbing his side" while defendant stood holding the gun. James said, "I'm fittin' to kill him. He just shot me. He just shot me." Defendant fired a few more shots and then "took off running." Alante testified that before the first shot was fired, he saw James "swung a punch at" defendant's chin.

¶ 18      On cross-examination, Alante acknowledged that he did not see James with a weapon. He denied that defendant and James argued about James being scared, claiming instead that they argued about the neighborhood bike. They did not have a heated argument, and James did not call anyone to tell them to bring a gun. He stated that when James knocked off defendant's hat, defendant was not in pain nor did he get knocked down. Alante stated that he thought defendant wore a black White Sox cap, and defendant's hair was not in dreadlocks. Alante stated that after James hit defendant, defendant was not bleeding nor did he notice any physical injury. After he was hit, defendant did not ride away on his bike or run away. Defendant reached into his waistband, pulled out a gun, and shot at James. Alante stated that the gun was dark blue, "black looking." After being shot, James fell backwards, saying "he shot me, I'm fittin' to shoot this b*** ass, he just shot me. I'm fittin' to kill him, I'm fittin' to kill him." Alante acknowledged that James never moved toward defendant or pulled out a weapon. Alante stated that James was facing defendant when defendant fired the last three to five shots.

¶ 19      Alante stated that defendant's brother took him to talk to defense counsel. He denied telling counsel that James raised his fists or flinched at defendant. He denied telling counsel that he got in the middle of defendant and James to break up their argument, or that a shot was fired while he was in the middle. Alante also denied telling counsel that defendant walked away after firing the first shot, that Alante rode away on a bike, or that James was going to use his phone to call someone to shoot. Alante stated he was friends with both defendant and James and did not want to see defendant get into trouble.

¶ 20      Defendant testified that a couple days before the shooting, a friend had been shot. The next day, defendant found a loaded pistol in the gangway behind his house, and he took the gun with him because his "friend had just got shot." Defendant testified that at the time, he and his friends, including James, "were just fightin' " and there "was a lot of stuff goin' on." Defendant did not know whether the gun was a revolver or a semiautomatic weapon, but described it as a "small little cap-type of gun."

¶ 21      On the day of the shooting, James demanded the neighborhood bike from him but defendant refused. Although James called him a b****, defendant ignored him and rode towards the water fountain. When defendant returned, James came off the porch and called defendant a "b*** ass n***." James put his hand in defendant's face, but defendant just laughed and thought "nothing of it." James then pulled out his cellphone and asked defendant if he wanted to fight or shoot because James would make a call to bring in other people. James put his phone away, and defendant started to ride away. James hit defendant in the back of the head and defendant told James to stop "puttin' your f*** hands on me." James

slapped defendant's hat off his head and the hat fell in the grass. He swung at defendant and grazed his chin, and "the first shot went off." After James told defendant he was "fittin' to kill" him, "the gun went off again. It went off a few more times." Defendant then ran to his grandmother's house and told her, "I messed up. I messed up, grandma."

¶ 22 On cross-examination, defendant stated that he had not seen James for two or three days prior to the shooting. He denied telling James that James was a coward. He stated that when James poked him in the head, it did not hurt and he suffered no physical injuries. He laughed it off and at that point was not afraid of James. He did not see James with a weapon, but defendant had a chrome gun with him. Defendant stated that when James hit him in the back of his head, it did not hurt or cause physical injury. Defendant was wearing a fitted White Sox cap, James knocked off his cap, and it fell on the grass outside the gate. After James punched him in the chin, defendant was not bleeding nor did he suffer injuries.

¶ 23 Defendant stated that Alante was on the porch and not between him and James when the shooting occurred. Defendant acknowledged that he pointed his gun at James and pulled the trigger. James fell to the ground and said, this "b*** ass n*** just shot me. I'm gonna kill him." Defendant shot James again, although he denied shooting James in the back. Defendant was concerned for his safety because James said he was going to shoot defendant. Defendant turned and looked away from James while firing. He did not know if he was shooting at James. Before turning himself in to the police, defendant got a haircut and did not call his friends to hang out on the block.

¶ 24 Officer Terrance McKitterick processed the scene. He recovered an adjustable baseball cap from the concrete steps. There were no caps on the grass parkway. The cap was not a White Sox cap; instead, it had a skull and a heart with the words, "Kills, love."

¶ 25 At the conclusion of the trial, the trial court noted important consistencies between Catherine's testimony and that of the other State witnesses. They stated that defendant and James were inside the fence and defendant did not wear a hat. The hat found at the scene was not the fitted White Sox cap defendant and Alante testified that defendant was wearing. Catherine's description of the gun was consistent with defendant's description, and her description of James being shot as he was crawling away was corroborated by the medical examiner's findings that James was shot in the lower back and buttocks. The trial court also noted inconsistencies in Alante's testimony and therefore had "a lot of problems with his testimony."

¶ 26 The trial court found that the evidence supported a conviction of first degree murder where defendant intentionally and knowingly shot James three times and James died from his injuries. The court found no evidence to support defendant's theory of imperfect self-defense. Defendant suffered no injuries, and his response to any provocation by James was "completely out of proportion to the provocation by the victim, if it occurred, which I highly doubt based upon the evidence." The trial court believed that the evidence pointed "to a verbal argument between the victim and defendant that resulted in the shooting of the victim three times." It found defendant guilty on all counts. The trial court subsequently denied defendant's motion for a new trial, finding that in considering the physical evidence and weighing the credibility of the witnesses, defendant's conviction "of first degree murder on all six counts was the appropriate decision."

¶ 27 At the sentencing hearing, the State presented testimony from Cook County correctional officer Wilkins that defendant was one of 29 inmates involved in a jail fight on April 29,

2014. Cook County sheriff's deputy Oscar Sanchez testified that after defendant was found guilty, he turned to the gallery, formed his hand into the shape of a gun, pointed and gestured as if he was pulling a trigger. Katrice Thomas, James' mother, testified that defendant's gesture seemed to be directed at her. Correctional officer Collins testified that on April 19, 2014, defendant punched another inmate who was handcuffed. Defendant denied gesturing a gunshot at James' mother, and stated he had stuck his middle finger up at James' brother, who was next to his mother, because the brother allegedly stuck out his tongue at defendant.

¶ 28    In sentencing defendant, the trial court considered the presentence investigation report as well as the testimony at the hearing and victim impact statements. It also considered defense counsel's arguments concerning the report, letters sent on behalf of defendant, a presentence memorandum submitted by defense counsel, defendant's statements to the court and his apologies to his family as well as to James's family. The court noted that defendant comes from an average middle class family with both parents working. He had been relatively trouble-free and "had a promising future. All of a sudden we come together at this particular location and time and a gun is pulled and one life is ended and the other life is changed forever. Forever."

¶ 29    The court also acknowledged defense counsel's arguments regarding the Supreme Court case of *Miller v. Alabama*, 567 U.S. 460 (2012), finding that a sentence of natural life in prison could be imposed on a juvenile offender under *Miller* as long as there is "a sentencing hearing in which these matters are considered. That's what we had in this case." The trial court also imposed the mandatory firearm enhancement, which "as it stands now," is "the law that [the court] must follow in this sentencing. So the minimum sentence that I can impose is 45 years all the way up to natural life. Obviously I don't believe that natural life is the appropriate sentence in this case. However, that being said, I do believe that a sentence above the minimum is appropriate in this case based upon the totality of the case and what I have heard, both at trial and in the sentencing." The court sentenced defendant to 52 years' imprisonment to be served at 100%. Defendant filed this timely appeal.

¶ 30                                              ANALYSIS

¶ 31    Defendant's first argument on appeal is that the evidence shows he shot James "out of actual, if unreasonable, fear of imminent harm" and therefore, he is guilty of second degree rather than first degree murder. Specifically, he argues that he is guilty of a form of second degree murder known as imperfect self-defense. Generally, self-defense is established by the following factors: "(1) force is threatened against a person, (2) the person is not the aggressor, (3) the danger of harm was imminent, (4) the threatened force was unlawful, (5) the person actually and subjectively believed a danger existed that required the use of the force applied, and (6) the person's beliefs were objectively reasonable." *People v. Washington*, 2012 IL 110283, ¶ 35. In arguing imperfect self-defense, defendant acknowledges that he committed first degree murder but "at the time of the killing he *** believe[d] the circumstances to be such that, if they existed, would justify or exonerate the killing ***, but his *** belief [was] unreasonable." 720 ILCS 5/9-2(a)(2) (West 2014).

¶ 32    To find defendant guilty of second degree murder, the State must first prove that defendant committed first degree murder beyond a reasonable doubt. *Id.* § 9-2(c). Defendant must then prove by a preponderance of the evidence the existence of a mitigating factor. *Id.* The State does not have the burden of proving the absence of a mitigating factor beyond a

reasonable doubt. *People v. Shumpert*, 126 Ill. 2d 344, 352 (1989). Here, defendant does not challenge the trial court's finding that the State proved him guilty of first degree murder beyond a reasonable doubt. He argues only that the trial court erred in finding that defendant did not prove the mitigating factor of his actual and unreasonable belief in self-defense. Therefore, viewing the evidence in the light most favorable to the State, we must determine whether any rational trier of fact could have found that defendant failed to prove he had an actual and unreasonable belief in self-defense by a preponderance of the evidence. *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996). "A preponderance of the evidence is evidence that renders a fact more likely than not." *People v. Urdiales*, 225 Ill. 2d 354, 430 (2007).

¶ 33    Defendant argues that he had an actual but unreasonable belief in self-defense because the evidence shows that three days before he committed the offense, a friend was shot in a drive-by shooting. The next day, defendant found a loaded pistol, and he took the gun with him because his "friend had just got shot." On the day James was shot, defendant and James were arguing for some time when James asked defendant if he wanted to fight or shoot because James would make a phone call "and have the whole block[ ] patched up." Defendant feared for his safety so he pulled out his gun and shot James. After the first shot, James threatened to kill defendant so defendant kept shooting. Afterward, defendant ran to his grandmother's house and told her that he "messed up." Defendant argues that he would not have shot James unless he feared for his life because he and James were longtime friends with no history of violence. He argues that the evidence does not support the inference that defendant would use force to counter a merely "ego-injuring" statement and the only reasonable inference is that he acted due to a fear of imminent harm, even if his fear was objectively unreasonable.

¶ 34    We disagree. Although defendant may have presented some evidence to support an unreasonable belief in self-defense, other evidence at trial does not support this mitigating factor. Catherine testified that on June 19, 2009, she observed defendant arguing with James in front of the building with six or seven other people also present. She did not see defendant or James touch each other, nor did she see a weapon initially. Catherine heard defendant say to James, five or six times in a loud voice, "Say it again. Say it again. I'll shoot the s*** out of you." There was no physical contact. Catherine then saw defendant pull a silver revolver from behind his back and shoot James, hitting him twice in the stomach. When James tried to crawl away, defendant shot him more times in the back. Defendant then ran toward Douglas Boulevard. Two other State witnesses, Kenneth and Renee, testified similarly about these events leading up to the shooting.

¶ 35    Although another State witness, Cordarrell, testified at trial that he did not tell the police anything about the shooting, he acknowledged that he had previously given a handwritten statement about the shooting. He testified, however, that the police told him what to say in the statement. Cordarrell's handwritten statement corroborated the testimony of Catherine, Kenneth, and Renee in that he saw defendant and James arguing "for awhile" and then he saw defendant shooting. Defendant was pointing his hand down towards the gate. Cordarrell heard three shots. James was lying in front of the house, and he appeared to have a wound to his stomach. None of the State's witnesses, including Cordarrell, saw James with a gun, and the gunshot wounds suffered by James are consistent with testimony that defendant shot James twice as James tried to crawl away. This evidence contradicts defendant's argument that he "had even an unreasonable belief that the use of deadly force was justified." *People v.*

*Brown*, 222 Ill. App. 3d 703, 721 (1991) (the trial court properly refused to give a voluntary manslaughter instruction where the evidence showed that the victim had no gun and was shot in the back of the head).

¶ 36 Whether defendant is guilty of first degree or second degree murder, or was justified in using deadly force because he was acting in self-defense, is a question for the finder of fact. *People v. Simon*, 2011 IL App (1st) 091197, ¶ 52. It is the responsibility of the fact finder to determine the credibility and weight of witness testimony, to resolve conflicts and inconsistencies in the evidence, and to draw reasonable inferences therefrom. *Id.* A reviewing court will not substitute its judgment for that of the finder of fact on issues involving the credibility of witnesses. *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 145.

¶ 37 The trial court here found the State's witnesses credible and, noting the inconsistencies in the testimony of Alante who was the only witness to corroborate defendant, had "a lot of problems with his testimony." The court further found that defendant had suffered no injuries; therefore, his response to any provocation by James was "completely out of proportion to the provocation by the victim, if it occurred, which I highly doubt based upon the evidence." "[T]he trial court was entitled to credit the [State] witnesses' testimony instead of defendant's to find that defendant did not prove that he had an unreasonable belief in the need to use self-defense against the victim." *Simon*, 2011 IL App (1st) 091197, ¶ 59. Based on all of the evidence in the record, a rational trier of fact could have found by a preponderance of the evidence that defendant failed to prove he had an actual but unreasonable belief in self-defense. We therefore affirm defendant's conviction of first degree murder.

¶ 38 Defendant next contends that his sentence of 52 years' imprisonment should be vacated and the case remanded for resentencing. First, he argues that he should be resentenced in accordance with the provisions of section 5-4.5-105 of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105 (West 2016)), because the legislature enacted this provision while defendant's appeal was pending. Section 5-4.5-105 addresses additional factors the court shall consider in mitigation when sentencing a defendant who was under the age of 18 when he committed the offense. These factors include defendant's "age, impetuosity, and level of maturity at the time of the offense"; whether defendant "was subjected to outside pressure, including peer pressure, familial pressure, or negative influences"; and defendant's home environment, his rehabilitation potential, as well as the circumstances of the offense. *Id.* § 5-4.5-105(a)(1)-(5).

¶ 39 In *People v. Wilson*, 2016 IL App (1st) 141500, *appeal allowed*, No. 121345 (Ill. Nov. 23, 2016) (consolidated with *People v. Hunter*, 2016 IL App (1st) 141904, *appeal allowed*, No. 121306 (Ill. Nov. 23, 2016)), this court addressed whether section 5-4.5-105 applied to the 17-year-old defendant's sentencing, where the provision became effective after his sentencing but while his direct appeal was pending. The court noted that in determining whether a statute may be applied retroactively, our supreme court has adopted the approach set forth in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994). *Wilson*, 2016 IL App (1st) 141500, ¶ 14. Pursuant to *Landgraf*, if the legislature has clearly prescribed the statute's temporal reach, this legislative intent " 'must be given effect absent a constitutional prohibition.' " *Wilson*, 2016 IL App (1st) 141500, ¶ 14 (quoting *Hayashi v. Illinois Department of Financial & Professional Regulation*, 2014 IL 116023, ¶ 23).

¶ 40    Section 5-4.5-105(a) provides that "[o]n or after the effective date of this amendatory Act of the 99th General Assembly, when a person commits an offense and the person is under 18 years of age at the time of the commission of the offense," the court "shall consider the following additional factors in mitigation in determining the appropriate sentence." 730 ILCS 5/5-4.5-105(a) (West 2016). The court in *Wilson* determined that the plain language of the provision clearly "demonstrates the legislature's intent that the statute apply to offenses committed after the [statute's] effective date" of January 1, 2016. *Wilson*, 2016 IL App (1st) 141500, ¶ 16. Therefore, section 5-4.5-105 could not be applied retroactively to the defendant's case. *Id.* ¶ 46.

¶ 41    Recent cases have also found that section 5-4.5-105 applies where an offense was committed prior to the provision's effective date, but the defendant's sentencing hearing occurs after the effective date. See *People v Reyes*, 2016 IL 119271, ¶ 12 (determining that section 4 of the Statute on Statutes, which entitles a defendant to be sentenced under the law in effect either at the time of the offense or at the time of sentencing, allowed application of section 5-4.5-105's sentencing factors to a defendant's re-sentencing hearing after the effective date); see also *People v. Hunter*, 2016 IL App (1st) 141904, ¶ 43 (finding that section 5-4.5-105 applied at sentencing hearings held on or after the effective date), *appeal allowed*, No. 121306 (Ill. Nov. 23, 2016) (consolidated with *Wilson*, 2016 IL App (1st) 141500, *appeal allowed*, No. 121345 (Ill. Nov. 23, 2016)). Here, defendant's commission of the offense and his sentencing hearing both occurred prior to the statute's January 1, 2016 effective date. Therefore, we find that section 5-4.5-105 does not apply here.

¶ 42    Defendant also argues that his sentence of 52 years' imprisonment violates the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11), because his sentence essentially is a sentence of "natural life" in prison and therefore "runs afoul of the constitutional principles" set forth in *Miller*.[1] The Supreme Court in *Miller* determined that "children are constitutionally different from adults for purposes of sentencing" due to their "diminished culpability and greater prospects for reform." *Miller*, 567 U.S. at 471. As *Miller* explained:

> "First, children have a 'lack of maturity and an underdeveloped sense of responsibility,' leading to recklessness, impulsivity, and heedless risk-taking. [Citation.] Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. [Citation.] And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity]. [Citation.]' " (Internal quotation marks omitted.) *Id.*

Not only do these characteristics diminish a juvenile's culpability, but these "distinctive attributes of youth diminish the penological justifications" for imposing life without parole on juvenile defendants. *Id.* at 472. *Miller*, therefore, concluded that a mandatory sentence of

---

[1]Defendant's only challenge to his sentence on appeal is whether it is constitutional under the eighth amendment and proportionate penalties clause. He does not argue, nor do we address, whether his sentence was otherwise inappropriate or excessive.

life without parole posed "too great a risk of disproportionate punishment" and required that before imposing such a sentence, the sentencing judge consider "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 479-80 .

¶ 43    In *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016), the Supreme Court elaborated on its ruling in *Miller*. It determined that the sentencing of a juvenile to life without parole is "excessive for all but the rare juvenile offender whose crime reflects irreparable corruption." (Internal quotation marks omitted.) *Id.* at ___, 136 S. Ct. at 734. "Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity' " of youth rather than "irreparable corruption." (Internal quotation marks omitted.) *Id.* at ___, 136 S. Ct. at 734. Therefore, in order to comply with the eighth amendment's prohibitions, the judge at a sentencing hearing must consider " 'youth and its attendant characteristics' " so that juveniles who may be sentenced to life without parole can be separated from those who may not. *Id.* at ___, 136 S. Ct. at 735 (quoting *Miller*, 567 U.S. at 465). The Supreme Court noted that the sentencing judge need not make an explicit finding of incorrigibility, and left for the states to determine how to enforce this constitutional restriction on the imposition of juvenile sentences. *Id.* at ___, 136 S. Ct. at 735.

¶ 44    Although the juvenile defendant in *Miller* was sentenced to a mandatory term of life imprisonment, our supreme court in *Reyes*, 2016 IL 119271, ¶ 9, applied the holding in *Miller* to a "mandatory term-of-years sentence that cannot be served in one lifetime." The juvenile defendant in *Reyes*, who was 16 years old when he committed the offense, received a mandatory minimum sentence of 20 years' imprisonment for first degree murder, plus a mandatory 25-year firearm enhancement, and 26 years for each of his two attempted murder convictions consisting of the minimum 6-year sentence for attempted murder plus a 20-year mandatory firearm enhancement. *Id.* ¶ 2. Pursuant to statute, the defendant was required to serve his sentences consecutively; therefore, he "was sentenced to a mandatory minimum aggregate sentence of 97 years' imprisonment" and "required to serve a minimum of 89 years" before being eligible for release. *Id.*

¶ 45    The State conceded, and the court agreed, "that defendant will most certainly not live long enough to ever become eligible for release." *Id.* ¶ 10. Our supreme court reasoned that such a sentence "has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole—in either situation, the juvenile will die in prison." *Id.* ¶ 9. The court held that to sentence a juvenile defendant to a mandatory term "that is the functional equivalent of life without the possibility of parole," without consideration of the mitigating factors of youth set forth in *Miller*, "constitutes cruel and unusual punishment in violation of the eighth amendment." *Id.*

¶ 46    Defendant here, who was also 16 years old when he committed the offense, was sentenced to 52 years' imprisonment which included a 25-year mandatory firearm enhancement. The minimum sentence he could have received was 45 years' imprisonment. Although the trial court determined that a sentence above the minimum was required, it did not believe "that natural life is the appropriate sentence in this case." Even if defendant served 100% of his sentence, he would be released at 68 years old. Although defendant's age upon release would fall toward the end of his lifespan, this sentence is survivable and thus

cannot be considered "the functional equivalent of life without the possibility of parole." See *id.* (extending *Miller* to a "mandatory, unsurvivable prison term").

¶ 47   Furthermore, even if defendant's sentence is "the functional equivalent of life without parole," it does not violate the eighth amendment. The Supreme Court in *Montgomery* held that for a life sentence to comply with the eighth amendment's prohibitions, the judge at a sentencing hearing must consider the characteristics of youth discussed in *Miller* so that incorrigible juveniles, who may be sentenced to life without parole, can be separated from those who have a potential for rehabilitation. *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 735. Here, defense counsel argued at the sentencing hearing that the trial court should consider the characteristics of youth in *Miller*. In sentencing defendant, the court explicitly recognized the holding in *Miller*, finding that a sentence of natural life in prison could be imposed on a juvenile offender as long as there is "a sentencing hearing in which [youthful] matters are considered. That's what we had in this case." The sentencing judge need not make an explicit finding of incorrigibility. *Id.* at ___, 136 S. Ct. at 735. We find that defendant's sentence complies with the requirements set forth for constitutionality in *Miller*, *Montgomery*, and *Reyes*.

¶ 48   Defendant's final contention is that his sentence is unconstitutional under the proportionate penalties clause of the Illinois Constitution. To succeed on this claim, defendant must show that his sentence is degrading, cruel, "or so wholly disproportionate to the offense that it shocks the moral sense of the community." *People v. Klepper*, 234 Ill. 2d 337, 348-49 (2009). Defendant provides little analysis or support for his contention, arguing only that his 52-year imprisonment sentence (which includes a mandatory 25-year firearm enhancement) "shocks the moral sense of the community" and merely citing *People v. Gipson*, 2015 IL App (1st) 122451, as support. *Gipson*, however, is factually distinct from defendant's case in that the juvenile defendant there was convicted of attempted murder, not first degree murder, and he had a documented history of mental health issues that "were not appropriately addressed." *Id.* ¶ 74. The defendant in *Gipson* was also sentenced under a sentencing scheme that did not permit the trial court to give appropriate weight to defendant's youth and mental disorders. *Id.* ¶ 75. As discussed above, the trial court here did in fact take defendant's youthful characteristics and considerations into account when imposing the sentence.

¶ 49   Furthermore, the 25-year mandatory firearm enhancement does not violate the proportionate penalties clause. Our supreme court has upheld the constitutionality of such enhancements, noting that the legislature has the power to establish mandatory minimum sentences and it took into account rehabilitative potential when applying the enhancements. *People v. Sharpe*, 216 Ill. 2d 481, 525-26 (2005). This court has also rejected the arguments of juvenile offenders that the imposition of mandatory firearm enhancements violates the proportionate penalties clause. *Hunter*, 2016 IL App (1st) 141904, ¶ 59; *People v. Banks*, 2015 IL App (1st) 130985, ¶¶ 19, 23-24 (holding that in contrast to *Miller*, *Roper*, and *Graham* where the trial courts were afforded no discretion under the sentencing statutes applicable in those cases, the operation of mandatory firearm enhancements does not preclude the trial court from imposing a sentence within the statutory range after considering factors relevant to the offense).

¶ 50                                     CONCLUSION
¶ 51          For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 52          Affirmed.